## NUGENT, GUARDIAN, ETC., ET AL. v. POWELL ET AL.

ADOPTION—PROCEEDINGS IN—ATTACK BY COLLATERAL HEIRS—COURTS—RECORDS—ADMISSIONS IN PLEADINGS—PARENT AND CHILD—RELINQUISHMENT OF CUSTODY—ABANDONMENT—STATUTES—CONSTRUCTION—CONSTITUTIONAL LAW.

1. That an entry was made in the records of the office of probate judge of the fact of the application and consent in the case of an adoption, is conclusively shown by a finding of fact by the district court, in the trial of a case involving the validity of certain adoption proceedings, that the probate judge after full inquiry consented to the adoption, but did not enter of record in the records of his office any consent or approval thereof, but did write out his consent and approval upon a detached piece of paper, and retained the same among the papers of his office; the evidence not disclosing that said probate judge kept the records of his office in any other way, and the statute failing to prescribe the manner in which they should be kept.

2. The failure of the judge to do his duty should not be held to work the destruction of the rights of others who have done all they were required to do in the matter.

3. Admissions in pleadings are conclusive, even though evidence is admitted, and the court, jury or referee find otherwise.

4. The petition stating that "the following order was entered by the probate judge, to-wit:" and containing a copy of such order, constitutes an admission that the order was entered in the records of the office.

5. A proceeding in adoption is purely a statutory matter, and to give validity thereto it must have been conducted in substantial conformity with the provisions of the statute.

6.   Section 2274 Rev. Stat. 1887, in relation to the adoption of children is complete in itself, and not in any manner qualified by Secs. 2275 or 2276.

7.   Secs. 2274 and 2279 qualify each other, and according to a correct construction thereof, upon application by one parent to relinquish all right to his or her child, it is the duty of the judge to make inquiry respecting the right of the parent making the application to make such relinquishment.

8.   If upon such inquiry it should be ascertained that the other parent is still living, and still possesses a right to the care, custody or control of the child, it would be the duty of the judge to refuse to approve the adoption without the written consent of such absent parent.

9.   On the other hand, in case it should be found that the other living parent had relinquished his or her right to the care, custody or control of the child it would not be necessary to have his or her consent.

10.   The right of a father with respect to his child is not an absolute paramount proprietary right or interest in or to the custody of the infant, but is in the nature of a trust reposed in him, which imposes upon him the reciprocal obligation to maintain, care for, and protect the infant; and the law secures him in this right so long and no longer than he shall discharge the correlative duties and obligations.

11.   Abandonment of a child by its father constitutes a relinquishment on the part of the father, and thereupon the mother becomes the natural guardian.

12.   Upon such relinquishment by abandonment, the mother has the right in adoption proceedings, to relinquish the custody and control of the child, and no rights of the father are affected thereby.

13.   Adoption proceedings without notice to an absent father, instituted upon the application of the mother, in which it is ascertained and found that the father had abandoned his child, are conclusive upon the parties to the proceedings and their privies; and such proceedings are not subject to attack by collateral heirs of the person adopting the child, on account of the absence of such notice.

14. Statutes which authorize an adoption without notice to, or consent of an abandoning parent, but with the consent only of the remaining parent are not unconstitutional.

[Decided May 19, 1893.]

ERROR to District Court for Laramie County, HON. RICHARD H. SCOTT, Judge.

The controversy in this case arose upon a petition for the distribution upon final settlement of the estate of Michael Powell, deceased, who had died intestate February 26, 1888, leaving neither a wife surviving him, nor a child of his blood. The petition was filed December 31, 1889, by Patrick Powell, father, Margaret Powell, mother, and John Powell, Patrick Powell, Jr., Hugh Powell, Margaret Taggart, Annie Powell and Sarah Powell, brothers and sisters, respectively, of the deceased, claiming to be the only heirs at law of said decedent, and asking that the estate be distributed between them. The petition was contested by the guardian of Emily Powell, formerly Emily Leonard, who, it was claimed, had been legally adopted as a child by said decedent and Elizabeth his wife on the 4th day of January, 1882. The petition was filed and the adoption proceedings were had in the probate court, which until statehood (July 10, 1890) had jurisdiction over the administration of the estates of deceased persons, and also the adoption of children. Upon the admission of the state all the records, papers and proceedings of the probate court, and all causes and matters of administration and other matters pending therein passed into the jurisdiction and possession of the district court. The matter of the distribution being undecided at the time the district court obtained original jurisdiction over said estate, it was heard and determined by that court and its final judgment rendered January 26, 1892, sustaining the claim of the petitioners above named. The adoption proceedings were adjudged void.

The mother of Emily Leonard had consented to the adoption, but the father was not present and was not notified. On the trial the probate judge who had allowed the adoption,

testified that the question was asked Mrs. Leonard whether the father of the child was a resident of Laramie County, Wyoming; and she answered that he was not. The question was asked whether he was providing for her or her child, and she answered that he was not and had not for at least a year previous, but had abandoned them, and that she was unable to provide for herself and children, and her reason for wishing to relinquish the child was to provide means for its maintenance and education. The mother was at that time, the witness testified, receiving assistance from the county. The three sections of the statute particularly affecting the adoption proceedings are as follows:

Section 2274. Any parent willing to relinquish all right to his or her minor child to any other person willing to adopt the same, shall make application to the judge of probate of the county in which such parent resides; and if such judge of probate, after due investigation, shall be satisfied that the person making said application is entitled to make such relinquishment, and that the person proposing to adopt such child is a suitable person to assume the relation of parent, and that the consent of both parties to such adoption is natural [mutual] and voluntary, he shall enter of record in the records of his office, the fact of such application and consent, with his approval of such agreement and adoption.

Sec. 2275. Any person may appear before the judge of probate of the county where he or she resides and offer to adopt any minor child as his or her own: Provided, such minor and his or her parents, if living, or guardian, if any, or county commissioners, as hereafter provided, shall appear and consent to such adoption.

Sec. 2279. In case the parent of any child is a non-resident of this Territory, or shall have removed from the county in which his or her child may be at the time it is proposed to adopt the same as aforesaid, the written consent of such parent, properly acknowledged, shall be obtained and filed with said judge of probate, which shall have the same effect as if such parent were personally present and consented to such adoption. And said judge of probate shall note the filings of such written consent in his record of approval, and the like proceedings shall be had as if such parent were present.

The adoption proceedings had not been entered of record in any book of records of the probate court; but pending the

contest upon the petition for distribution—on Jan. 25, 1892 —the district court ordered the written relinquishment of the mother and the order of the court made thereon to be entered of record by the clerk of the court nunc pro tunc. The other facts and special findings and conclusion of the trial court are sufficiently stated in the opinion. Motion for new trial was overruled. Proceedings in error were instituted on behalf of Emily Powell, the adopted child, in the name of Francis J. Nugent, her regular guardian, and Melville C. Brown, guardian ad litem.

*Brown & Arnold,* for plaintiff in error.

If the child Emily was lawfully adopted there can be no question as to her right to the estate. (Rev. Stat., Sec. 2286.) If the judgment of adoption was not void, but voidable on the ground of irregularity, then it cannot be attacked in this proceeding collaterally. That judgments of courts of record and courts of general jurisdiction cannot be collaterally attacked is axiomatic. (Skinner v. Moore, 30 Am. Dec., 164; Greer v. Rhyne, 67 N. C., 340; 1 Black on Judg., secs. 245, 246, 250, 252, 270.) And the question of jurisdiction is to be tried by the record itself. As to judgments of domestic courts of record and of general jurisdiction, their jurisdiction is conclusively presumed, unless the record itself discloses a failure thereof. (Jackson v. Dyer, 104 Ind., 516; Coit v. Haven, 30 Conn., 190; Carpentier v. City of Oakland, 30 Cal., 440; Hahn v. Kelley, 34 Cal., 391; Black on Judg., sec. 273; McCormick v. Sullivant, 10 Wheat, 192; Walker v. Cronkite, 40 Fed., 133; Granger v. Clark, 22 Me., 128; Morse v. Presley, 25 N. H., 299; Cook v. Darling, 18 Pick., 393; Hartman v. Ogbom, 54 Pa. St., 120; Defour v. Comfranc, 11 Martin (Da.) 607; Rogers v. Bauchamp, 102 Ind., 33; Homer v. State Bank, 48 Am. Dec., 355; Lawler v. White, 27 Tex., 250; Allen v. Huntington (Vt.) 16 Am. Dec., 702; Swearingen v. Gulick, 67 Ill., 208; Burke v. Elliott, 4 Ired. L., 359; Moore v. Gridley, 75 N. C., 41; Prigg v. Adams, 2 Salk., 674; Finneran v. Leonard, 7 Allen, 56; Bridgeport Savings Bank v. Eldridge, 73 Am. Dec., 638, and note 693.)

Probate courts are courts of record, and entitled to presumption of jurisdiction. (Musselman's appeal, 65 Pa. St., 485; McPhersal v. Cunlif, 11 S. & R., 422; Shroyer v. Richmond, 16 O. St., 455; Johnson v. Beazley, 64 Mo., 250; Doolittle v. Holbon, 28 Vt., 819; Tucker v. Harris, 13 Ga., 1; Deuxden Obert v. Hummel, 18 N. J. L., 75; Duckworth v. Duckworth, 35 Ala., 70; Osborn v. Graham, 30 Ark., 67; Dayton v. Mintzer, 22 Minn., 393; Boston v. Robbins, 126 Mass., 384; Guco v. Coml. Bk., 70 Cal., 339; Martin v. Robinson, 67 Tex., 368; 40 Id., 179; Woodruff v. Cook, 2 Edw., Ch. 259; Wells on Juris., secs. 32-46; Black on Jd., sec. 287; Griffith v. Frazier, 8 Cranch, 9; McNitt v. Turner, 16 Wall, 353; Moffitt v. Moffitt, 69 Ill., 641.) The statute in reference to adoption was, however, fully complied with. The only attack upon the judgment is by an attempt to show from evidence de hors the record that the child had a father living, and that the mother was not entitled to make relinquishment. If that were so the probate court, having the right to inquire and did inquire into that matter, made a mistake; but that mistake cannot be connected in these proceedings or inquired into. While the judgment of adoption was possibly erroneous it cannot be attacked collaterally. (Authorities cited above: Huff v. Hutchinson, 14 How., 586; Thompson v. Tolurie, 2 Pet., 157; Bannister v. Higginson, 15 Me., 73; Davidson v. Thornton, 7 Pa., 128; Clark v. Bryan, 19 Md., 1; Howgson v. Meden, 77 Va., 704; Spencer v. McConagle, 107 Ind., 410.) If the right of the mother to relinquish the child was jurisdictional, the probate court passed upon that question and necessarily found that it had jurisdiction; and its conclusion whether erroneous or not cannot be contradicted by extraneous evidence. (McCormick v. Sullivant, 10 Wheat, 192; Walker v. Cronkhite, 40 Fed., 133; Granger v. Clark, 22 Me., 128; Morse v. Presley, 25 N. H., 269; Rodrigas v. E. Riv. Sav. Inst., 63 N. Y., 460; Coit v. Haven, 20 Conn., 190; Hartman v. Ogbom, 54 Pa. St., 120.) Section 2282 Rev. Stat. provides that in cases of abandonment of children the county commissioners shall consent to the adoption. Evidence improperly admitted shows that such commissioners had such knowledge

of the matters then before the probate court, from which fact the court evidently concluded that they did consent. But in this case there was abandonment by one parent only. The conditions therefore did not exist for the commissioners' action. We have no statute expressly covering a case like the one at bar.    When the father dies or is incapable of acting the mother becomes the guardian.    (Rev. Stat., Sec. 2250.)    The father having abandoned the child, may be said to be incapable of acting.    He had no right to the child after abandonment, and therefore no reason for his consent existed. (Winans v. Luppie, 47 N. J. Eq., 302.)    The district court became the legal successor of the probate court; could it hold its former judgment void?    (In re Bush, 47 Kan., 264.)    The collateral heirs stand in no better attitude than Powell himself before his death.    As against the child they can assert no right to the estate.    Powell, having done all he could to lawfully adopt the child, would have been estopped from denying his obligations of support.    The father, mother, brothers and sisters are now estopped from asserting any claim.    (Appeal of Wolf, 13 Atl., 760.)    The record of a judgment is not the judgment itself, but evidence of it.    If a court fails to enter a judgment such failure is attributable to negligence of the officers.    The rendition of a judgment is a judicial act; its entry upon the record ministerial.    (Black on Judg., Secs. 110, 111; Freeman on Judg., Secs. 37, 38; Matthews v. Houghton, 11 Me., 377; Fish v. Emerson, 44 N. Y., 376.)    The judgment is in no wise affected by failure of the record.    It was subsequently recorded by order of district court.    This would be sufficient in any event.

*Lacey & Van Devanter,* for defendants in error.

If the facts did not bring the case within the jurisdiction of the probate court, it matters not that it may have concluded there was such jurisdiction.    (Griffith v. Frazier, 8 Cranch, 9, as where an ordinary might issue letters upon the estate of a person not dead; Jochumsen v. Suffolk Sav. Bk., 85 Mass., 87; McPherson v. Dunliff, 11 S. & R., 430.)    Courts of inferior or limited powers must not only act within the

scope of their jurisdiction, but on the face of the proceedings it must appear that they so acted. (1 Black on Judg., Sec. 282.) Adoption proceedings are summary, and not according to the course of the common law. It is well settled that where a court of general jurisdiction has special and statutory powers conferred upon it which are wholly derived from statute, it is to be regarded as quoad hoc, an inferior or limited court, and its judgments to be treated accordingly. (1 Black on Judg., Sec. 279; Brown on Juris., p. 61; Galpin v. Page, 18 Wall., 371; Haywood v. Collins, 60 Ill., 328; Gray v. Steamboat Pe., 6 Wis.; 59; Thatcher v. Powell, 6 Wheat, 119; Shelby v. Bacon, 10 How. (U. S.) 56-69; Anderson v. Conners, 12 O. St., 636; Prentice v. Parks, 65 Me., 559; Granite Bk. v. Treat, 18 Me., 342; N. J. Railroad, etc., v. Suydam, 17 N. J. L., 30; People ex rel. v. Warden, 100 N. Y., 20.) It is upon this principle that the cases in relation to adoption proceedings are cited by the text writers. (Brown on Juris., p. 64. N., 1; Tyler v. Reynolds, 43 Ia., 146; Long v. Hewitt, 44 Ia., 363; Furgeson v. Jones, 17 Or., 204; Foster v. Waterman, 124 Mass., 592.) A court cannot acquire jurisdiction to hear and determine any matter affecting the rights of any person, without notice in some form to such person. (1 Black on Judg., Sec. 221; Denning v. Corinne, 11 Wend., 647; Bloom v. Burdick, 1 Hill, 140; Simmons v. Wood, 6 Yerg., 522; Corliss v. Corliss, 8 Vt., 373; Booneville v. Ormrod, 26 Mo., 193; Chase v. Hathaway, 14 Mass., 193; Eddy v. People, 15 Ill., 385.) The adoption proceedings were void, there having been no notice to the father. The father has the paramount right to the custody of his minor children, both at common law, and the statutes of this state. (Shouler on Domestic R., Secs., 238, 245, 251, 252 and 248; Rev. Stat., Secs. 1545, 2250, 2251 and 2253.) If by the use of the word "parent" in the statute, is meant a single parent, then the father is the one intended. Even if both father and mother have the right to the custody of the child, that right is to be exercised conjointly. As to construction of such a statute, see Wales v. Stetson, 2 Mass., 143. The statute must be so construed as not in any way to infringe the rights of the father, if such construction be pos-

sible. If it be not possible the statute is unconstitutional. The proceedings were not in the probate court. The whole matter seems to have occurred in vacation before the probate judge. Indeed, the statute seems to indicate that the matter is not intended as a proceeding in court at all. There is therefore no judgment of adoption which is attacked collaterally or otherwise. No question of abandonment was properly before the probate court or judge. There cannot be abandonment without intent; not only was there no evidence of such intent on the part of the father, but he obtained a decree of divorce giving him the custody of the child, and he had repeatedly offered and attempted to take and support her. No adoption became operative until entry of record. There is nothing in the record to show that the entry was ever made even by the district court. After the death of Powell, the descent was cast, and his heirs are those who were such at that instant. No entry in the record was made, in any way, prior to the death of Powell. It took such an entry to render the adoption operative at all. There is no estoppel as claimed by counsel for plaintiffs in error. Void judgments create no estoppel. (2 Black on Judg., Sec. 513.)

CLARK, JUSTICE.

This case comes before this court upon exceptions duly reserved, taken by plaintiffs in error to sundry rulings, findings of fact, conclusions of law and final decree made by the district court of Laramie County in the matter of the final distribution of the estate of Michael Powell, deceased. The matter was heard in the court below upon the petition for final distribution, filed by the defendants in error, the answer of Emily Powell, by Francis J. Nugent, her guardian, one of the plaintiffs in error to said petition and the reply of defendants in error thereto, and the evidence adduced in support of the issues presented by said pleadings.

It appears from the record that on July 1st, A. D. 1891, M. C. Brown, one of the plaintiffs in error, was duly appointed guardian ad litem of said child, Emily Powell, and qualified as such. From the record these facts conclusively appear: That

the child Emily Powell is the daughter of one John Leonard and Esther Leonard, born in lawful wedlock in the month of November, 1877, at Hillsburgh in the State of California, while the said father and mother were living together. In August, 1878, nine months after the birth of said child, John Leonard, the husband and father, left his family and went to San Francisco, California, and has lived there ever since. The wife and four children, including the child Emily, remained at Hillsburgh until June, 1879, when they removed to Omaha, Nebraska, where they remained until May, 1880, in which month they removed to Cheyenne, Wyoming, where they have lived since.

At the time Leonard left his family in August, 1878, he left them without money or means of support, and in circumstances of extreme destitution, and from that time up to the time of the adoption proceedings hereinafter mentioned he in no way whatever contributed to the support of his wife and children, except the sum of twenty dollars furnished them while they were at Omaha, Nebraska, and before they came to Cheyenne, Wyoming, in May, 1880, and this notwithstanding the fact that during most of the period he was earning reasonable wages and could have contributed to their support had he so desired, and also notwithstanding the fact that the wife and children frequently appealed to him for assistance and apprised him of their destitute condition.

Prior to the date of the adoption proceedings, John W. Leonard, in a court of competent jurisdiction of the State of California, obtained a decree of divorce from his said wife, and in said decree he was awarded the custody of the child Emily. On the 4th day of January, 1882, Esther Leonard, who was then living in Cheyenne, Wyoming, with her four children, appeared before the probate judge of Laramie County, Wyoming; made application to relinquish her child Emily and consented that she might be adopted by Michael Powell, the son of Patrick and Margaret Powell and the brother of the full blood of the other six defendants in error. In this proceeding she filed in the office of said probate judge, as stated in the petition of defendants in error for distribu-

·tion, from which we quote, "a paper in writing, in the words
and figures following, to-wit:"

·"In the Probate Court of Laramie County.    Territory of
  "Wyoming.
"To Isaac Bergman, Judge of Probate:
·   "The undersigned, Mrs. Esther Leonard, would respectfully
"represent that she is the mother of Emily Leonard, a minor
"female child of the age of four (4) years, and is willing to
"relinquish all right to the said Emily Leonard to Michael
"Powell and Elizabeth Powell, his wife, who have signified
"their willingness to adopt such child and to assume the rela-
"tion of parent to her, and she further represents that she is
·"a resident of Laramie County, Territory of Wyoming.
                              "Mrs. Esther Leonard.

"Sworn to and subscribed to before me this 4th day of
"January, A. D. 1882.
                     "Isaac Bergman, Judge of Probate.

"and thereupon the following order was entered by the said
"Probate Judge, to-wit:

                              · "January 4, 1882.
"Matter of adoption of Emily Leonard, a minor.
   "On this day came before me Mrs. Esther Leonard and
"Michael Powell, and the said Mrs. Esther Leonard made her
"application in writing to relinquish all her right to her minor
"child Emily Leonard, aged four (4) years, of which she is
"the mother, to the said Michael Powell and Elizabeth Powell,
"his wife, and the said Michael Powell and Elizabeth Powell
"being willing to adopt the said minor child Emily Leonard,
"I hereby consent to and allow such adoption to be made.
"Said child to be hereafter known as Emily Powell.
                              "Isaac Bergman, Judge."

   Upon the hearing before the probate judge evidence was
introduced tending to show that the father was living, but

had for a long time prior thereto wholly abandoned his wife and said children.

Michael Powell died intestate at Laramie County, Wyoming, February 24, 1888, owning real and personal property in said county. He left surviving him neither wife nor children of his body begotten. His estate was fully administered upon, and being in condition for distribution this controversy arose between the defendants in error and the said child Emily, concerning the property left by the deceased.

In the said adoption proceedings no notice of any kind was given to said John Leonard, nor did he in any manner consent to said adoption of the said child, nor did he in any way appear in said proceedings or in relation thereto.

Upon these facts the court found as conclusions of law that John W. Leonard had abandoned the child Emily before and at the time of said adoption proceedings; that Esther Leonard was not entitled to make any relinquishment of said child; that said adoption proceedings were and are void and of none effect, and that the defendants in error were the heirs and only heirs-at-law of said Michael Powell, deceased, and entered up a decree accordingly.

Motion for new trial was filed, and overruled, and the case brought for review to this court.

Upon the argument of this cause these main questions were presented to the court, viz.:

First. Were the adoption proceedings had before the probate judge of Laramie County, Wyoming, in conformity with the provisions of the statute relating thereto?

Second. Is the action of the probate judge in allowing and consenting to the adoption of the child Emily by Michael Powell subject to collateral attack in this proceeding?

Third. Are the circumstances surrounding the case such, that Michael Powell would have been, and consequently these defendants in error, his privies in blood and in law, are estopped to deny the validity and legality of the proceedings in adoption?

It is evident that if the first and third questions, or either of

them, are answered in the affirmative, or the second in the negative, that the action of the court below must be reversed and the cause remanded. But before proceeding to the consideration of these questions, it may perhaps be well to dispose of one subsidiary proposition and get it out of the way.

The statutory provisions relating to the adoption of children in this State are to be found in Sections 2274 to 2286, inclusive—R. S., 1887. Those which relate particularly to this controversy are as follows: 2274, 2275, 2276, 2277, 2278, 2279 and 2286.

It will be observed that section 2274 provides that in cases of adoption, the probate judge "shall enter of record in the "records of his office the fact of such application and consent "with his approval of such agreement and adoption."

Upon the hearing below the court found as a fact that the probate judge, after full inquiry, consented to the adoption of the child Emily, and we quote: "but did not enter of record "in the records of his office any consent or approval of such "adoption. The court further finds that the said judge of "probate did write out his consent and approval of such adop- "tion upon a detached piece of paper and retained the same in "his office among the papers of his office, which said paper is "in the words and figures following, to-wit:" and then is set forth the consent order, set forth in our statement of facts, supra.

Upon the argument it was strongly urged that inasmuch as the probate judge failed to enter the order as required by the statute the adoption did not take place; that he entry of the order of consent was a condition precedent to the adoption.

There was no evidence upon the hearing tending to show that the said probate judge kept the records of his proceedings or the proceedings of his court in any other way than by writing them out upon sheets of paper; and inasmuch as there was no statute prescribing the manner in which the records should be kept, whether in bound books or upon pieces of paper, we know of no rule of law which would prohibit him from keeping his records in the way in which it seems he did in this case; he certainly had very ancient authority for so

doing, for at common law "a record signifies a roll of parch-
"ment upon which the proceedings and transactions of a
"court are entered or drawn up by its officers." 3rd Steph.
Com., 583. Substantially the same definition is given in
3rd Black Com., 24. But in the United States paper has
universally supplied the place of parchment as the material
for the record. 2 Burr Law Dict., Title Record, Hahn v.
Kelly, 34 Cal., 422. And hence we think that the facts found
by the court below show conclusively that the entry was made
as required by statute. But even if this were not so we are
unable to see how in this case and in cases of this nature it
can be said that the failure of the probate judge to do his duty
should be held to work the destruction of the rights of others
who have done all that they were required to do in the mat-
ter. Abney v. Deloach, 84 Ala., 394-402. But a conclusive
answer to the contention upon this proposition is to be found
in the fact that in the pleadings in this matter, as will appear
from that portion of the petition of defendants in error, cop-
ied in the statement of facts, it is expressly admitted that the
order was entered. The only reasonable construction that can
be given to the language of the petition is that the order was
entered by the probate judge in the records of his office. This
admission having been made there could be no finding of
fact to the contrary, for the reason that it is well settled that
admissions in pleadings are conclusive even though evidence
is admitted and the court, jury or referee find otherwise.
7 Bacon's Abridgment; Van Dyke v. Maguire, 57 N. Y., 431;
Ballou v. Parsons, 11 Hun. 602. See also upon this question
generally Van Fleet on Collateral Attack, Sec. 688.

We now come to the main question in the case, viz.: Were
the adoption proceedings had in conformity with the provis-
ions of our statute? The determination of this question de-
mands an examination of the statute, and also of the general
principles of the law relating to the rights and duties of par-
ents and children. It must be admitted in the beginning that
a proceeding in adoption was wholly unknown to the common
law, and in our system of jurisprudence it is purely a statu-
tory matter; hence it follows that in order to give any va-

lidity to such proceedings they must have been conducted in substantial conformity with the provisions of the statute, and its requirements observed; but notwithstanding this it ought not to be overlooked in the examination of cases growing out of the exercise of this statutory right, that the right is a beneficial one both to the public and to those immediately concerned in its exercise. Since its incorporation into our system (and the fact is such statutes have been adopted in nearly every one of our States) the homes of many childless parents have been brightened and made happier because the law enabled them to bring into that home a child upon whom their affections could center and develop. Many an orphan child and many a child whose parents were unable by misfortune or their own infirmities to care for, have by means of this statutory right found good homes, loving and affectionate parents, and thereby grown up to be good and valuable members of society, when otherwise they would have spent their early years in ignorance and vice, and in such surroundings have grown up to young manhood or young womanhood simply to swell the overflowing ranks of the vicious and criminal classes of society; and hence it seems to me that in cases of this kind it is not the duty of the courts to bring the judicial microscope to bear upon the case in order that every slight defect might be enlarged, and magnified, so that a reason might be found for declaring invalid an act consummated years before; but rather approach the case with the inclination to uphold such acts, if it is found that there was a substantial compliance with the statute. Van Fleet on Collateral Attack, Sec. 1, p. 3. Several cases were cited to us upon argument, in which collateral heirs attacked proceedings of this nature, and in which the courts held that the statute being in derogation of the common law rights of the natural heirs, it must be rigidly construed. I am unable to perceive how the rights of the natural heirs were affected by the act of adoption, because at the time of the act they had no rights whatever under the law—no one is the heir of the living. Sewall v. Roberts, 115 Mass. App., 277-278.

From a careful and thorough examination of our statutes

we are convinced that section 2274 is complete in itself and is not in any manner qualified by sections 2275 or 2276. These three sections provide for two different methods of adoption. Under section 2274 any parent having the right to relinquish his or her child, may make application to the probate judge for leave so to do. If the judge is, upon inquiry, satisfied of the parents' right to relinquish, and that the persons proposing to adopt are suitable persons, and that the consent of the parent and of the persons adopting is mutual and voluntary, he shall enter the fact of such application and consent with his approval thereof. In proceeding under this section it is clear that the initial step is to be taken by the parent. It is also clear that in proceeding under sections 2275 ond 2276, the initial step is to be taken by the parties proposing to adopt the child. It is also clear to our minds from the language used in section 2276, that the Legislature made and intended to make a distinction between the two proceedings; that section provides that in cases brought under section 2275 the probate judge after due investigation, if satisfied as provided in section 2274, shall make a "like entry of record" as specified in section 2274. The requirement that the proceedings authorized by sections 2275 and 2276 shall in certain respects be conducted in the same manner as required by section 2274 necessarily implies different proceedings. We are unable to perceive how we are to avoid this construction unless we refuse to give force and effect to the plain words used in the statute. We think also that sections 2279 and 2274 qualify each other, and that the true construction of these two sections is as follows: When a parent makes application to the probate judge to relinquish all right to his or her child it is among other things the duty of the probate judge to make inquiry as to the right of the parent making the application to make such relinquishment, and if upon such inquiry it should be ascertained that the other parent of the child is still living, and still possesses a right to the care, custody or control of the child, it would be the duty of the judge to refuse to approve such adoption unless the written consent of such absent parent was obtained and filed. On the other hand, if the judge should

find that the child had another parent living, and also that that parent had relinquished his or her right to the care, custody or control of the child it would not be necessary to have his or her consent; "the parent" referred to in section 2279 is a parent who still possesses some right in or to the custody over and control of the child which he or she can relinquish. To give any other construction to the statute would be tantamount to saying that the Legislature intended that the consent of a parent who had ceased to have any interest in the child was still necessary to enable the other parent to transfer his or her interest in it.  Van Fleet on Collateral Attack, sec. 408.

This brings us to the consideration of the question whether or not the mother in this instance had the right to relinquish the child, or, to use the words of the statute, was "entitled to make such relinquishment."

Upon the argument it was strongly, forcibly and eloquently urged upon the court by the distinguished counsel for defendants in error, that even though the statute does not in terms "require notice to the absent father where proceedings were in- "stituted for the adoption of his child by a stranger, such a pro- "ceeding so materially affecting and invading his rights would "be invalid and without jurisdiction unless upon due notice to "him, that he might have the opportunity of defending and "protecting his rights.  That if the statute should be so con- "strued as to authorize the adoption of a child with the "consent of the mother but in the absence of the father, and "without his consent, and without notice to him, such con- "struction would render the statute unconstitutional and "therefor any proceeding under it void.  That if the expres- "sion 'the parent' or 'any parent,' as used in sections 2274, "2277 and 2279 is meant to give to a single parent where both "are living the right to relinquish, then the father is the par- "ent intended because he it is who has under the law the right "to the custody and services of the child and who is charged "with its maintenance and nurture.  That 'the fundamental "principle of the common law was that the father possessed "the paramount right to the custody and control of his minor

"children and to superintend their education and nurture.
"The mother as such had little or no authority in the prem-
"ises.' The father had in America the paramount right of
"custody of his minor child in the absence of statutes to the
"contrary. And in this State the common law of England
"has been directly and distinctly adopted, and hence the com-
"mon law rule as above stated must obtain here. That the
"statute provides for no forfeiture of his or her rights by any
"parent, so that the other shall succeed to all the rights; and
"without some statutory provision it is plain that there could
"be no such forfeiture; that the only case or cases in which
"one parent could be held to have forfeited to the other any
"right to their child would be the case or cases where such
"forfeiture is provided for by the statute itself. That in this
"case, if the probate judge decided anything on the question
"of abandonment he assumed to hear and decide that ques-
"tion and thereby invade and materially affect the rights of
"the father, and this too without any averment of abandon-
"ment, without any statutory authority in him to hear that
"question, and without giving to the father by any kind of
"notice whatever any day in court; such a determination in
"the light of reason and of the authorities is absolutely void,
"whether the conclusion reached by the probate judge was
"true or otherwise. A judgment without notice to the defend-
"ant is utterly void, no matter whether the claim on which it
"is based is just or unjust."

Such, in brief, is the argument made by defendants in
error; we have stated it so fully because we desire to give the
fullest consideration to it. In the first place it is to be re-
membered that this entire argument in support of a father's
alleged rights is not made in a case in which a father is seek-
ing to establish those rights. The father is not before this
court and is a stranger to these proceedings; it is made in
a case in which the collateral heirs of Michael Powell are seek-
ing to have declared invalid a proceeding in which Michael
Powell participated, and they base their claim not upon the
fact that the legal rights of the person under whom and
through whom they claim have been invaded, but upon the

fact that the rights of a stranger to this contest, who is not here complaining, have been infringed. Still, notwithstanding this fact, this court will fully admit that if the propositions contended for by defendants in error have place in the law, as applied to this case; then the consequences claimed by them must follow.

But what are the rights of a father with respect to his child?

It is claimed in this case, and there are many sayings in the books, that at common law the father has the paramount right to the custody of his child, and that independently of statutes such is the prevailing rule in America. If this statement simply means that inasmuch as the law has imposed upon the father the duty of caring for and maintaining his minor child, and therefore has given him the custody and control of it in order that he might the better perform these duties, the statement may be accepted as accurate; and in a general way it may be said that all things being equal the father has a better right to the custody and services of his child than has the mother, because the law primarily imposes upon the father the duty of maintenance and nurture. But it is, I think, well settled that the father has not an absolute vested right in the custody of his child.

Judge Story, in the case of United States v. Green, 3rd Mason, at page 485, states what I conceive to be the true rule as follows:

"As to the question of the right of the father to have the "custody of his infant child in a general sense it is true. But "this is not on account of any absolute right of the father, "but for the benefit of the infant, the law presuming it to be "for its interest to be under the nurture and care of his nat- "ural protector both for maintenance and education. * * * "It is an entire mistake to suppose the court is at all events "bound to deliver over the infant to his father or that the "latter has an absolute right in the custody."

It may well be doubted whether the rule of the common law was other than as stated in the case above cited. From an examination of the authorities it will be found that prior

to 1804 the English courts entertained precisely the views expressed by Judge Story, and quoted above. In that year, the decisions in England took a direction in favor of establishing the paramount right of the father to the custody of his infant child, and continued in that direction until they culminated in the famous decision rendered in 1836 in the case of King v. Greenhill, 4 Ad & Ellis, 614, in which case three children, females, aged respectively five and a half, four and a half and two and a half years, were in custody of the mother, a woman of unblemished, reproachless character; upon application of the father, who was living in open adultery with another woman; the children were taken from the mother and delivered over to the custody of the father. These decisions led to the introduction of a bill in Parliament relating to the custody of infants, which finally, in 1838 or 1839, became a law and restored the mother to her natural rights and put her upon an equality with her husband in relation to the care and custody of her children within the age of nurture. In the debate upon the bill Lord Lyndhurst, referring to the decision in King v. Greenhill, said:

"As the laws now stand the father of a child born in lawful "wedlock was entitled to the entire and absolute control and "custody of that child and to exclude from any share in that "control and custody the mother of that child. The mother "might be the most virtuous woman that ever lived, amiable "in her manners, fond and attached to her children; the father "on the other hand might be profligate in character, brutal "in manner, living in adultery, and yet would have the right, "under the existing law, to the custody of the children of his "marriage to the exclusion of even access to them of his wife, "their mother."

Lord Denman, who was the Chief Justice of the King's Bench, and who concurred in the decision in the above cited case, in the course of the debate upon the bill referred to, said:

"In the case of Greenhill which had been decided in 1836, "before himself and the other judges of the King's Bench, "he believed that there was not one judge who had not felt

"ashamed of the state of the law, and that it was such as to "render it odious in the eyes of the country. The effect in "that case was to enable the father to take his children from "his young and blameless wife, and place them in charge of a "woman with whom he then cohabited."

If such was the common law of England it is not surprising that Lord Denman might say he was ashamed of it. But as stated by Chief Justice Ranney in Gishwiler v. Dodez, 4 Ohio St., at page 623, I am strongly disposed to think that the learned Chief Justice of the King's Bench mistook a judicial excrescence upon the law for the law itself, and that Parliament did little more than restore it to its former condition. If, however, the English cases alluded to were fair expressions of the common law, it is safe to say that they have never found place in American jurisprudence; and I have no sort of doubt but that in American jurisprudence the right of a father to the custody of his child is not an absolute inalienable right, but that it is in all cases referable and subordinate to the interest and welfare of the child. Mercein v. The People, 25 Wend., 63.

It has been said that "By the law of nature the father has "no paramount right to the custody of his child. By that law "the wife and child are equal to the husband and father. * * "There is no parental authority independent of the supreme "power of the State. But the former is derived altogether "from the latter. In the civil state there is no inequality be-"tween the father and the mother. Ordinarily a child during "infancy is entirely under the discipline of its mother: and "very frequently wives discharge the duty of education of "their children better than the husbands. De Felice, Lec-"tures on Natural Rights, Lecture 30. It seems then by the "law of nature, the father has no paramount, inalienable right "to the custody of the child; and the civil or municipal law "in setting bounds to his parental authority, and in entirely "or partially depriving him of it in cases where the interests "and welfare of his child requires it does not come in conflict "with or subvert any of the principles of natural law." Mercein v. The People, 25 Wend., page 103.

13

This right which is given by the municipal law to the father is strictly speaking more in the nature of a "trust" than anything else. As was said by Lord Redesdale in Wellesley v. Wellesley, 2 Bligh, N. S., 124. "Why is the parent entrusted "with the care of his children? Because it is generally sup- "posed that he will best execute the trust imposed in him, "for that it is a trust of all trusts the most sacred none of your "lordships can doubt." See also Ex parte Crouse, 4 Whar., 11.

The true doctrine was stated in In re Moore, 11 Iv. C. L. N. S. 1, by Hayes, Justice, as follows:

"The dominion which a parent has over a child is a quali- "fied one and given for the discharge of important trusts. "He will be secured in it so long as, and no longer than he "discharges the correlative duties; and a failure in them, "under circumstances and to an extent to bring on him the "brand of 'unfitness,' amounts to a forfeiture of his right and "warrants the interposition of the proper legal tribunal for "the protection of the child by wresting from the parent the "trust which he has abused or which the court plainly sees "he is unable or unwilling to perform."

The right to custody and services of the child and the obligation to support and educate are reciprocal rights and obligations; they are dependent upon each other; they do not exist apart. One may not and ought not to be permitted to deny the obligations, to refuse to perform them and still claim the existence of the right.

In Chapsky v. Wood, 26 Kans., 652 and 653, Justice Brewer in delivering the opinion of the court says:

"A child is not in any sense like a horse or any other chattel, "subject matter for absolute and irrevocable gift or contract. "The father cannot by merely giving away his child release "himself from the obligation to support it nor be deprived of "the right to its custody. In this it differs from the gift of "any article which is only property. If to-day Morris Chapsky "should give a horse to another party that gift is for all time "irrevocable and the property never can be reclaimed; but he "cannot by simply giving away his child relieve himself from

"the obligation to support that child, nor deprive himself of "the right to its custody.                    ♠

"A parent's right to the custody of a child is not like the "right of property, an absolute and uncontrollable right. "If it were it would end this case and relieve us from all fur- "ther difficulties: A mere right of property may be asserted "by any man, no matter how bad, immoral or unworthy he "may be, but no case can be found in which the courts have "given to the father who was a drunkard and a man of gross "immoralities the custody of a minor child, especially when "the child is a girl.  The fact that in such cases the courts "have always refused the father the custody of his child, shows "that he has not an absolute and uncontrollable right there- "to."

In Hocheimer, Custody of Infants, at Sec. 10, we find this statement of the American rule:

"The general result of the American cases may be char- "acterized as an utter repudiation of the notion that there can "be such a thing as a proprietary right or interest in or to the "custody of an infant, or that a claim to such custody can "be asserted merely as a claim, and the general drift of opin- "ion is in the direction of treating the idea of trust as the "controlling principle in all controversies in relation to such "custody."

And hence, from a careful examination of the question we come to the conclusion that the right of a father with re- spect to his child is not an absolute paramount proprietary right or interest in or to the custody of the infant, but is in the nature of a trust reposed in him, which imposes upon him the reciprocal obligation to maintain, care for and protect the infant.  And that the law secures him in this right so long and no longer than he shall discharge the correlative duties and obligations.  The fact that by a mere gift of his child or a contract with reference to its custody the father may not divest himself of the right to the custody of his child to such an extent that he may not reclaim it, does not militate against this conclusion.  Such right to reclaim has its founda- tion in the regard which the courts have for the interest and

well being of the child, and not out of regard to the rights of the father, and it may well be that though a gift of one's child to another may at the time appear to be for the best interests of the child, that afterwards circumstances may arise which would render it imperative upon the father to revoke that gift and reclaim his child. But in cases of abandonment, such as is disclosed by this record, the court would hesitate a long time before it would restore the father to the custody of the child. It may be that even in such cases the law preserves a locus pœnitentiæ for the father, but proof of his repentance ought to be very convincing before he should be restored to his parental privileges.

And it follows from the foregoing that the contention of counsel for defendants in error that there can be no forfeiture of a father's right except by means of some statutory provision cannot be sustained. Take this case. The facts found by the court below upon this proposition are substantially as follows:

"That nine months after the birth of the child the father "left his wife Esther Leonard and their four children without "means of support, and in circumstances of extreme destitu- "tion and never thereafter up to the time of the adoption "proceedings in question (a period of three years and five "months) contributed to the support of his wife and children "except the sum of twenty dollars furnished them while in "Omaha, and before said family came to Wyoming in the "month of May, 1880, and during all that period had left the "said child Emily to the sole support and care of its mother, "Esther Leonard; that the said John Leonard during most of "said period was earning reasonable wages and was thereby "enabled to contribute to the support of his said family had "he desired to do so."

And the court further expressly finds that these acts con- stitute an abandonment of the child by the father—and of this there can be no sort of doubt in the mind of anyone who will read the record.

In the face of these facts how can it be said that this father did not by his own acts forfeit and part with and lose all the

rights which he possessed in and to the custody and control and services of this infant child; not only did he forfeit all of his rights, but so far as he was able to do, if he could by any act of his make any transfer of such rights, he transferred them to the mother. The finding of fact is that he "during "all of that period had left the said child Emily to the sole "support and care of its mother, Esther Leonard."

The father in this case parted with all of his rights. It did not require any transfer on his part in order that the right of custody, control and services of the child might devolve upon the mother. In such a case as this in which a father has cruelly deserted his family, and refused to recognize and be bound by those obligations which not only the law but nature and the plainest instincts of humanity imposed upon him, upon whom should devolve the care and custody of an infant child nine months old, if not upon its mother? Is there a case to be found in the books in which the lawfulness of the custody and control of an infant child by its mother under such circumstances as appear in this case has been denied? If there be such a case then it is a case in which every principle of natural law and common justice and right has been utterly and entirely disregarded.

Our statute, Sec, 2250, R. S., provides "The father is the "natural guardian of the persons of his minor children. If "he dies or is incapable of acting, the mother becomes the "guardian." This statute is but declaratory of the general rule and in that view we may consider it.

Is it to be said that the words "incapable of acting" when viewed in the light of the general principles of the law, are not broad enough by fair and reasonable intendment to cover and embrace this case. If the father had been convicted of a crime and imprisoned in the penitentiary, in such case he certainly would be "incapable of acting." Such would be the case if he should become insane, and such also in my opinion would be the case if he should become mentally weak to such "an extent as to bring on him the brand of unfitness." Such would be the case if he should become unable by reason of physical disabilities to perform the ordinary duties of a nat-

ural guardian of the person of his child. Or if by reason of physical infirmities it became necessary to place a father in a hospital or sanitarium for a long period of time in order that he might have the constant care of nurses and physicians. Would it not be a case within the spirit and meaning of the rule expressed in the statute? And certainly, when we consider that the object of the rule is to appoint or recognize someone who shall have and exercise personal supervision and control over the child for the benefit of the child. We cannot doubt that a father who has separated himself from his child, wilfully deserted and abandoned it and continues to do so, has within the fair meaning of this rule by his own acts rendered himself "incapable of acting," and such being the law it follows that in this case the mother became the natural guardian of her child upon the father's abandonment.

In Clark v. Bayer, 32 Ohio St., 310, the court after an exhaustive review of the authorities say:

"From authority and reason the following propositions "may be stated generally:

"1. As a general rule the parents are entitled to the cus-"tody of their minor children. When the parents are living "apart, the father is prima facie entitled to that custody, and "when he is a suitable person, able and willing to support and "care for them his right is paramount to that of all other "persons except that of the mother in cases where the infant "child is of such tender years as to require her present care: "but in all cases of controverted right to custody the welfare "of the minor is first to be considered.

"2. The father's right, however, is not absolute under all "circumstances. He may relinquish it by contract, forfeit it "by abandonment, lose it by being in a condition of total ina-"bility to afford his minor children necessary care and sup-"port."

In Commonwealth v. Dougherty, 1st Pa. Leg. Gaz. 63, cited at page 376-7, Am. and Eng. Enc. of Law, Vol. 17, the court held that:

"A parent may relinquish the care, custody and control of "his child and after having done so his right to claim it is

"gone and will not be enforced by the court. Second, such "relinquishment by a parent of a child may be either by a "deed or other instrument in writing; or it may be by parol, "or by abandonment, or by turning it out of the house and "permitting it to go upon its own resources; and such re-"linquishment or abandonment may be presumed from the "act of the parties."

In Pennsylvania a statute provided that justices of the peace who performed the ceremony of marriage of minors without the consent of the parents should be liable to the father in the sum of $50.00, which might be recovered in an action.

In the case of Stansbury against Bertron, 7th Watt. & S., at page 364, a justice of the peace solemnized the marriage of plaintiff's minor daughter, and plaintiff brought suit against the justice. The defense was that the father was a drunkard, often intoxicated, and when in that condition frequently turned the daughter out of doors, and that he told her to go about her business and do for herself. The supreme court speaking by Gibson, C. J., held this to be a good defense, saying "But the father had ceased to stand in the relation of a "parent, or consequently of a party who could be grieved. "By turning his daughter loose on the world to shift for her-"self, he relinquished his paternal right in relation to her "person, and absolved her from filial allegiance."

In Farrell v. Farrell, 3 Hous. (Dela.) 639, which was an action brought by a son against a father to recover the amount of the son's wages earned by him during his minority and collected by the father, the court charged the jury:

"If therefore, the defendant neglected or refused to sup-"port and maintain his son, or denied him a home or discarded "or abandoned him so that he was forced to labor abroad to "procure a living for himself he is not upon any principle "of law or justice entitled to the earnings of his son; because "under such circumstances the law will imply that the father "has emancipated or freed the son from his service and con-"ceded to him the right to enjoy the fruits and profits of his "own labor."

For other cases upon this general doctrine see Liberty v. Palermo, 79 Me., 473; McCarthy v. Boston & L. R. R. Co., 148, Mass. 550.

From the foregoing we conclude that at the time of the adoption proceedings, and for a long time prior thereto, this father by his own acts had parted with and relinquished all right in and to the custody of the child; that under the circumstances of this case, the mother at said time was and for a long time prior thereto had been lawfully and exclusively in the custody and control of the child, and had the right to relinquish. that custody and control, and no rights of the father were affected thereby, because upon the conceded facts he had no rights in the premises, having divested himself of them.

. But it is contended that the probate judge had not the power, in the absence of the father and without notice to him, to determine the question of abandonment by him; and further, that if the statute is to be so construed as that it confers upon the mother in such case as this the power to make such relinquishment without notice to or consent of the father, then the statute deprives the father of his sacred rights without due process of law, and is unconstitutional.

We will examine these two contentions in their order.

What is abandonment? It is simply the evidentiary fact which proves the ultimate fact of relinquishment; in other words, the relinquishment of one's rights is the effect and result of one's abandonment of those rights. As we have seen, this relinquishment "may be either by a deed or other "instrument in writing, or it may be by parol or by abandon- "ment or by turning the child out of the house,". etc. Commonwealth v. Doughtery, supra.

In this case it was by abandonment, which I conceive in cases of this kind to be the strongest possible kind of relinquishment; but suppose that instead it had been by deed executed by the father and the mother had produced the deed, could it in such a case be successfully contended that in order to enable the judge to determine the due execution of the deed or its effect that notice to the father was necessary in

order that he might have the opportunity to come in and say whether or not it was obtained from him by duress or fraud? I apprehend not. Or suppose that the mother had brought with her to the judge the written consent of the father, would it then have been necessary for the judge to have given notice to the father before he proceeded to determine whether or not the paper purporting to be executed by him, in order that he might have opportunity to say that it was not executed by him was so executed or was or was not procured from him by duress or fraud? I think not. And what is the difference in principle in the three cases? In either case the judge would be required to determine whether or not the act or deed was the act or deed of the father and the legal effect thereof. It might be that in either case the father might avoid the proceeding by showing perjury in the evidence establishing abandonment, or forgery in the execution of or fraud or duress in the procurement of the instrument of relinquishment or consent; but it does not follow that because the proceedings may be voidable they were also void and open to such collateral attack as is attempted here. Nay more, we may go still farther, and say that notwithstanding these proceedings in adoption the father might at any time since they took place have brought an action for the recovery of the possession or custody of the child, and no one will contend, or perhaps can successfully contend that in such case these adoption proceedings would constitute a bar to the father's action, or that they were conclusive upon him. But it does not follow that because the adoption proceedings were not conclusive upon the father they were not conclusive upon the parties to the proceedings and their privies. Van Fleet, Collateral Attack, sec. 408; Barnard v. Barnard, 119 Ill., 93; Fridge v. The State, 3 Gill & J. (Mo.), 112-113; Sewall v. Roberts, 115 Mass., at page 275-276; Jenkins v. Peckinpaugh, 40 Ind., 133; Davis v. Greve, 32 La. Ann., 420; Plume v. Howard Sav. Inst., 46 N. J. L., 227; on the contrary, we think they are, and so hold.

As to the constitutionality of the statute when construed as we construe it, we have this to say: An examination of the

statutes of adoption in force in the United States, will show that in several states the consent of and notice to abandoning parents is not required. It is enough if the fact of abandonment is made to appear, then the remaining parent may consent to the adoption. This is the case in Colorado, Illinois, Alabama, and perhaps other states. After careful search we have been unable to find any case in which the constitutionality of such statutes has been denied or questioned, and certainly we have not been referred to any.

Upon principle I am unable to conceive of any valid constitutional objection to the statute as we construe it. Under the facts of this case we are without doubt that the mother could lawfully exercise all the common law rights of the parents without any express consent of the father; and no reason occurs to us why she could not also under the circumstances of this case exercise the statutory power of both parents with respect to the adoption of the child. Van Fleet, Collateral Attack, Sec. 408; Sewall v. Roberts, 115 Mass., at pp. 277-278.

The case of Ferguson v. Jones, 17th Oregon, 204, was strongly urged upon us as being exactly in point with and decisive of this case. But from an examination of that case we are of opinion that except upon one minor proposition it substantially supports the views herein expressed. No attempt was made in that case to show that the father had abandoned the child, and there is a clear intimation in the original opinion and also in the opinion upon rehearing that had such been the case, neither his consent or notice to him would have been necessary. It is true that the Oregon statute provides that in cases where the parent has abandoned his child the court may proceed as if he were dead, but in our opinion this is the rule in the absence of a statute.

But little stress was laid at the argument upon the fact found by the court that the father had prior to the adoption proceedings obtained a decree of divorce from the mother, in which he was awarded the custody of the child. It appears from the findings that he not only abandoned the child before the decree was obtained, but continued to abandon it even

after the decree and up to the time of the adoption. We do not consider this fact as of much consequence, nor as materially affecting the case.

Our conclusion upon the whole is that Emily Powell, alias Emily Leonard, was the lawfully adopted child of the late Michael Powell, and that the district court of Laramie county erred in its decree.

The decree of that court is reversed and the cause remanded to it with instructions to further proceed in this matter in accordance with the views herein expressed.

GROESBECK, C. J., and CONAWAY, J., concur.