In the Matter of the Estate of ABIJAH MANN, JR., Deceased.

Surrogate's Court, Kings County, September 30, 1930.

*Rumsey & Morgan*, for the petitioner.

*Winthrop, Stimson, Putnam & Roberts* [*Albert W. Putnam* of counsel], for Gladys Frost Ogden.

*John H. Schmid*, special guardian for Elizabeth Ogden Newman, an infant.

WINGATE, S. The present accounting raises questions of testamentary construction affecting the distribution of the remainders of two trusts erected by the will of Abijah Mann, Jr., who died on

September 9, 1868, and whose will and codicil were admitted to probate in this court on November ninth of the same year.

By the 13th and 14th items of his will testator created trusts in one-eighth parts of the residue of his estate for the lives of seven of his grandchildren, one, and that here in question, being for Mary Ann Rodman.

The devolution of the remainders of these trusts was directed by the 15th item, which reads as follows: " As to each of the eight equal shares or parts of my said residuary real and personal estate above mentioned given and devised in trust as aforesaid for my grandchildren as above provided, I give, devise and bequeath the same in fee and absolutely after the death of such grandchildren severally to such one or more of the children or descendants of such grandchildren of mine and in such shares and proportions as such grandchildren of mine severally by his or her last will and testament or instrument in the nature thereof   *   *   *   shall devise, direct or appoint; and for want of such devise, direction or appointment and so far as the same shall not extend I give the same absolutely and in fee after the death of such grandchildren of mine severally to his or her child or children share and share alike who shall be then living and to the child or children of a deceased child of such grandchildren of mine to take the same share which his, her or their parent if living would be entitled to.  And if such grandchildren of mine severally shall have no such child or descendant who shall survive him or her, then I give the same in fee and absolutely after the death of such grandchildren of mine severally to his or her heirs at law."

This direction was modified by a provision of the codicil which reads: " And whereas, I have by said will given my residuary estate in eight equal shares in trust to apply the income thereof to the use of my daughter Anna N. Fincke and to each of my seven grandchildren being her children and those of my deceased daughter Mary Ann wife of Thomas H. Rodman and have given the said shares so held in trust for said grandchildren in the event of any of them dying without issue to his or her heirs at law.

" I do hereby in that event give and bequeath the share of such grandchild so dying without issue to his or her surviving brother and sister equally and in fee and to his or her heirs forever."

The trust of the one-eighth of the residue for Mary Ann Rodman was duly erected and she enjoyed its benefits until the time of her death, which occurred on July 1, 1929.  She was survived by only one child, Gladys Frost Ogden, who was born on December 31, 1883, two other children having predeceased her, both unmarried and neither leaving issue.  Gladys Frost Ogden is now living and

has six children: Gladys G. Ogden, who is of age, and Sidney Ogden Newman, Herbert G. Ogden, Jr., Ann H. Ogden, Faith N. Ogden and Elizabeth C. Ogden, who are minors, and one grandchild, Elizabeth Ogden Newman, a daughter of Sidney Ogden Newman who was married subsequent to the death of the life tenant. This granddaughter was born ten months and six days after the death of the life tenant and must, therefore, be held not to have been in being at the time of her death.

Mary Ann Rodman left a will and codicil which were admitted to probate by the Surrogate's Court of New York county on October 29, 1929. Her testamentary directions did not, in express terms, purport to exercise the power of appointment of the remainder of her trust in one-eighth of the residue of the estate of Abijah Mann. It did, however, contain a general residuary clause which, as modified by her codicil, gave her entire estate after general and specific legacies to trustees to divide into as many portions as she had grandchildren, or descendants of predeceased grandchildren, to pay the income to them for life and to pay over the corpus to their descendants.

As bearing upon the validity of this disposition of the remainder of her trust under the will of Abijah Mann, if such it be, it is to be noted that all of the grandchildren for whom these residuary trusts were erected are children of testatrix's daughter, Gladys Frost Ogden, who, herself, was born on December 31, 1883, more than fifteen years after the death of Abijah Mann.

The will of Mary Ann Rodman, by its terms, purported to dispose of all her property. In view of this fact, the provisions of section 18 of the Personal Property Law become pertinent. This reads:

" § 18. Power to bequeath executed by general provision in will. Personal property embraced in a power to bequeath, passes by a will or testament purporting to pass all the personal property of the testator; unless the intent, that the will or testament shall not operate as an execution of the power, appears therein either expressly or by necessary implication."

The proper construction of this enactment has been made the subject of several authoritative determinations. Thus the Court of Appeals said, in *Lockwood* v. *Mildeberger* (159 N. Y. 181, at p. 186): " It is not pretended that she expressed an intent that the residuary clause should not operate as an execution of the power, nor do we think that it appears by necessary implication. Such an intent is not to be implied from the fact that no reference was made to her grandmother's will, or to the power of appointment therein conferred upon her, for the disposition of all her own property operated under the will as an exercise of such power of appointment.

The omission of all reference to it, therefore, does not imply an intent not to execute the power. * * * it will not suffice to indulge in assumptions, for the law requires that the intent not to execute the power must appear either expressly or by necessary implication. Necessary implication results only where the will permits of no other interpretation. * * * The intent not to execute the power, therefore, must not be implied unless it so clearly appears that it is not to be avoided."

In *Speir* v. *Benvenuti* (197 App. Div. 209) the court said (at p. 212): " * * * the necessary implication of intent not to exercise the power must appear in the will itself." To like effect see *McLean* v. *McLean* (174 App. Div. 152, 156; affd., 223 N. Y. 695); *Hirsch* v. *Bucki* (162 App. Div. 659).

In view of these rules of law, it is of course obvious that Mary Ann Rodman must be held to have attempted by her will to exercise the power of appointment given her under her grandfather's will, and the next question for attention is the effect, if any, of her act in this direction.

It is, of course, primary that the validity of the exercise of a power of appointment must be determined by reading the instrument purporting to exercise the power into the document by which such power was granted, and construing the two as a single entity. (*Genet* v. *Hunt*, 113 N. Y. 158, 170; *Dana* v. *Murray*, 122 id. 604, 616; *Hillen* v. *Iselin*, 144 id. 365, 373; *Matter of Terwilligar*, 135 Misc. 170, 174; affd., 230 App. Div. 763.)

When this is done in the case at bar, it is found that the effect of the appointment is to create a second life estate for persons who did not come into being until long after the death of the original testator, namely, for the children of Gladys Frost Ogden, who, herself, was not born until more than fifteen years after the probate of his will. Such a limitation is within the inhibition of section 11 of the Personal Property Law (as amd. by Laws of 1929, chap. 229) and section 42 of the Real Property Law (as amd. by Laws of 1929, chap. 229) which prohibit the suspension of the absolute right of alienation of property for more than two lives in being at the time of the creation of the estate. (*Hillen* v. *Iselin*, 144 N. Y. 365, 378.) It, therefore, follows that the exercise of the power of appointment was void in so far as it attempted to create secondary life estates. Furthermore, the remainders are limited to persons whose identity and shares cannot presently be ascertained, and whose interests are not absolutely vested, for which reason these remainders cannot be accelerated. (*Matter of Terwilligar*, 135 Misc. 170, 184, 185, and cases cited; affd., 230 App. Div. 763.) As a result, the entire attempted exercise of the power of appointment is void and the remainder of the one-eighth residuary trust passes under the alterna-

tive gift of the original testator to the only child of Mary Ann Rodman, namely, Gladys Frost Ogden.

There is further presented for determination the question as to the proper distribution of the remainder of the trust erected by the 6th item of Abijah Mann's will. This clause gave certain property at Red Hook to trustees to convert into money and to divide the proceeds into three parts, two of which were to be held in trust for other grandchildren and the third for Mary Ann Rodman for life. The direction respecting the remainder, as contained in the will, read: " * * * on their respective deaths either before or after my decease to pay over such respective portions so invested or intended to be invested to the respective heirs of my said three grandchildren."

In his codicil the testator altered this direction to read as follows: " * * * on the death of either of them leaving *lawful issue* I give and bequeath the share of such deceased grandchild to such *issue* absolutely and for want of issue to his or her surviving brother or sister equally and to their heirs at law." (Italics not in original.)

It is the contention of Gladys Frost Ogden that the italicised word " issue " should be read " child " or " children " and that consequently she should be awarded the remainder of this trust to the exclusion of her children, while their special guardian maintains the reverse and urges a *per capita* distribution to all of the descendants of Mary Ann Rodman living at the time of her death.

The rule of law invoked by the special guardian had its authoritative genesis in the determination of the Court of Appeals in *Soper* v. *Brown* (136 N. Y. 244.) The question there presented was as to whether great-grandchildren of a testator were entitled to take under a gift to a daughter and her " issue." In holding that they were, the court says (at p. 248): " I am of opinion that the word ' issue ' in a deed or will, when used as a word of purchase and where its meaning is not otherwise defined by the context, and there are no indications that it was used in any other than a legal sense, comprehends all persons in the line of descent from the ancestor and has the same meaning as ' descendants,' and that while it embraces the children of the ancestor, it is because they are descendants in common with all other persons who can trace direct descent from a common source."

The court continues (at p. 249): " Mr. Jarman and other text writers state the rule in conformity with the great weight of authority, that while the meaning of the word ' issue ' is not inflexible, and may in some cases designate ' children ' only, depending upon the intention as disclosed upon the whole instrument, nevertheless where its meaning is not restrained by the context,

it is to be interpreted as synonymous with ' descendants,' and as comprehending objects of every degree, and that the construction is the same whether used in a bequest or devise * * *."

At page 250: " When one speaks of the ' issue ' of a person deceased, I think in most cases he would intend his descendants in every degree. * * * I am of the opinion that in the majority of cases where the word ' issue ' is used, it is used in its legal sense. * * * It is settled that under a gift to ' issue,' where the word is used without any terms in the context to qualify its meaning, the children of the ancestor and the issue of such children, although the parent is living, as well as the issue of deceased children, take in equal shares *per capita* and not *per stirpes*, as primary objects of the disposition."

This decision was made on December 13, 1892.

While it may be said that parts of the opinion quoted were *obiter dicta* on the facts presented, the reaffirmation of the same doctrines in *Schmidt* v. *Jewett* (195 N. Y. 486) is not open to like criticism. In that case the question was squarely presented as to whether children and grandchildren of a life tenant should share *per capita* in a remainder gift to the issue of the life tenant.

The court, in the course of an opinion which quoted largely from its former decision in *Soper* v. *Brown*, said (at p. 490): " It is well settled in this state that the words ' legal issue,' when used in a will and unexplained by the context, have the meaning of descendants. * * *

" The nine after-born grandchildren of the life tenant do not take by representation, but directly as descendants of the testator."

In *Matter of Farmers' Loan & Trust Co.* (213 N. Y. 168, 173) Judge CARDOZO points out that " The presumption in this state favors a *per capita* distribution * * * but the presumption yields to ' a very faint glimpse of a different intention.' "

In the last cited case a direction that the issue " take equally what would have been the parent's share " was viewed by the court as an indication of a desire for stirpital distribution, and a similar result was attained in *Matter of Union Trust Co.* (170 App. Div. 176; affd., 219 N. Y. 537), where the will directed division in " equal portions," testator's " predetermining intent in this will " being held to be " equality among his grandchildren."

The decision of the Appellate Division for the First Department in *Petry* v. *Petry* (186 App. Div. 738) casts an interesting sidelight on the rule here under discussion. In a learned and elaborate opinion, in which the entire court concurred, Mr. Justice PAGE, after reviewing the decisions hereinbefore considered, declared himself unable to find anything in the context of the will at bar

which would justify a departure from the rule of distribution *per capita* to descendants of unequal degrees, but frankly stated that he believed " such a construction does violence to the intention of the testator." He said, however, that he felt constrained by controlling decisions of the Court of Appeals to follow it. After an exhaustive examination of the alleged bases of the rule in English law, he concluded that it was the result partially of a misconception of the scope of early English decisions and partially of conditions which never possessed cogency in this country.

The decision ends with the following pregnant paragraph: " In *Matter of Farmers' Loan & Trust Co. (supra)* the court quoted with approval and applied *Dexter v. Inches* [147 Mass. 324] and in affirming this court in *Matter of Union Trust Co. (supra)* have shown an inclination to abandon the rule laid down so clearly in *Soper v. Brown (supra)*. We can only express the hope that the Court of Appeals will do so. Until they do we are compelled to follow the earlier decisions, and affirm this judgment."

The Court of Appeals failed to heed this earnest plea and unanimously affirmed the judgment without opinion (*sub nom. Petry v. Langan*, 227 N. Y. 621), thus in effect emphatically reaffirming the doctrine of *Soper v. Brown*.

The Legislature finally came to the rescue, and by chapter 379 of the Laws of 1921, effective April 30, 1921, changed the rule by section 47-a of the Decedent Estate Law, which, however, was, in terms, limited to " a person dying after this section takes effect," and, therefore, has no application to the questions presented in the case at bar.

The entire subject is summed up by Judge CARDOZO in *New York Life Insurance & Trust Co. v. Winthrop* (237 N. Y. 93, at p. 105): "A stubborn rule of law bound the courts for many years to a holding that a gift to ' issue ' was to be treated as a gift *per capita*. The rule was often deplored * * *. It yielded to ' a very faint glimpse of a different intention ' * * *. It was followed, when there was no escape, in submission to authority. A recent amendment of the Decedent Estate Law * * * has wiped it out for the future."

The question here presented for determination is whether an examination of the four corners of this testamentary disposition will reveal to this court that faint glimpse of a contrary intention which will justify a departure from the rule of *Soper v. Brown*.

The supplemental memorandum submitted on behalf of Gladys Frost Ogden calls attention to several considerations which, it is argued, support a stirpital construction, and these will be briefly considered.

The opening paragraph of the will reads: " This is the last Will and Testament of Abijah Mann, Junior, of the City of Brooklyn, State of New York, Counsellor at Law."

The entire document gives unusual evidence of careful planning and draftsmanship. This fact, coupled with the profession of the author, would, under ordinary circumstances, lend weight to the position of the special guardian that words of art incorporated therein were used by the testator in their strict legal significance and connotation. Advancing from this position, the special guardian lays stress on the change in the terms of the original will effected by the codicil in this connection. The will directed the distribution of the remainders of this trust " to the respective heirs of said three grandchildren," while in the codicil the gift was changed to " issue."

It is, of course, indisputable, as pointed out by counsel for Mrs. Ogden, that in this use of the word " issue " the testator, who died in 1868, could not have employed the term in reliance upon the decision of *Soper* v. *Brown,* which was not decided until 1892. It is, however, familiar knowledge to all well-informed members of the bar that in the early days before precedents became as numerous as they now are, both bench and bar were much more accustomed to rely on the statements of text-writers than at present. In fact, in *Soper* v. *Brown* the court bases its enunciation of the rule in question particularly on the statement of that former *vade mecum* of testamentary construction, Jarman on Wills. The court has taken occasion to ascertain that the first edition of this famous work was produced in 1843 and that its original text contains the following statement: " It is observable that, in *Lees* v. *Mosly* [1 You. & Coll. 589] (and the same remark applies to many other cases) it does not distinctly appear whether in pronouncing ' issue ' to be a word of purchase, the court intended to construe it as synonymous with children, or as admitting descendants of every degree. The latter, it is presumed, would be its construction in the absence of a restraining context." (2 Jarman Wills [1st ed.], 352, 353.)

It is, therefore, apparent that at the time the will at bar was drawn, an authority of such eminence that the highest court in the State felt justified in relying upon it, had for approximately a quarter of a century advocated as the proper construction of the word the meaning for which the special guardian contends. In view of this fact, is it not probable that a member of the bar whose workmanship on this will gives every evidence of learning and ability, deliberately changed the phraseology of his testamentary disposition with this authority in mind?

Much of the supplemental brief on behalf of Mrs. Ogden is

directed to an attempt to demonstrate from other portions of the will and codicil that testator's purpose in his testamentary directions was for stirpital distribution and to argue therefrom that an intention on his part here existed for like action, hoping thereby to demonstrate that "faint glimpse" of intention contrary to the rule of *Soper* v. *Brown* which might lead to an avoidance of the rule.

Reading the will as a whole, the outstanding intention of the testator is apparent to benefit his children and grandchildren. Aside from an annuity and life use of a house to his wife (2d item of will and 1st of codicil), remembrances to three sisters and a brother (will, items 7, 9; codicil, items 3, 4 and 6) and legacies of $10,000 each to two sons-in-law, one in lieu of executor's commissions (will, item 3; codicil, item 2), the entire estate goes to his children and grandchildren by name, but in every gift except gifts of personal property and the remainder interest of the house, the use of which is given to the widow for life, the benefit conferred is in trust. In this connection the following four trusts are important: *first*, the Red Hook trust under item 6 of the will and item 5 of the codicil; *second*, a trust in the Frankfort property (items 9 of the will and 7 of the codicil); *third*, a trust in $25,000 (items 10 of the will and 8 of the codicil); and the residuary trust (items 12 and 15 of the will and 9 of the codicil). With the exception of the $25,000 trust, the provisions for devolution of the remainders as set forth in the will were altered or added to by the codicil. In this the remainder throughout was given to the "right heirs at law" of the granddaughter in case of her prior decease. In the Frankfort trust the remainder was originally given to two named granddaughters and their respective heirs, but the latter provision was eliminated in favor of the survivor. It seems apparent that no stirpital intention can be spelled out of either of these provisions, particularly in view of the fact that the bequest to the "right heirs" of Jane W. Cathran under the $25,000 trust are quite possibly construable rather as words of limitation than of purchase. (*Waxson Realty Corporation* v. *Rothschild*, 135 Misc. 124.) This leaves for consideration merely the Red Hook trust now under review and the residuary trust. Can an intention on the part of the testator to confer *per capita* benefits be read from the latter? To this court that is impossible. In both portions of the disposition, the respective life tenants are expressly empowered to appoint their respective remainders to "one or more of" their respective "children or descendants." This would seem to demonstrate an entire lack of interest on the part of the testator as to the ultimate destination of such remainders so long as they passed into

the possession of one of his blood. This idea is further borne out by the alteration made in the codicil to the effect that if any life tenant died "without issue" the remainder of his share should pass to his surviving brother or sister.

The Standard Dictionary defines "intention" as "a settled direction of the mind toward the accomplishment of a particular act." This obviously implies action which is entirely incompatible with the disregard here demonstrated.

To argue that this testator preferred a great-granddaughter, who was not born until more than fifteen years after his death, to her children appears to this court little short of an absurdity. Truly, testator wished his property to remain with those of his blood; but so far as demonstrating a preference between individuals, all of whom complied with this requirement and none of whom could by any possibility have been known to him, he could not reasonably be expected to have or exhibit it.

To the court, however, there is internal evidence in the will that the testator fully understood the use of the word "issue" and used it advisedly in the sense advocated by Mr. Jarman and subsequently confirmed in *Soper* v. *Brown*.

In the 15th item of the will the testator says: "And if such grandchildren of mine severally shall have no such *child or descendant* who shall survive him or her, then I give the same in fee * * * to his * * * heirs at law." (Italics not in original.)

In altering this disposition in the codicil, the testator says: "Whereas I * * * have given the said shares so held in trust for said grandchildren in the event of any of them dying without *issue* to his or her heirs at law * * *." (Italics not in original.)

The inevitable demonstration of these two clauses would seem to be that in the terminology of testator the word "issue" is understood and intended to include "descendant," which is precisely the rule of *Soper* v. *Brown*.

It would, therefore, seem a logical assumption that when, in the alteration of the Red Hook trust, the remainder was expressly changed to a limitation to "issue," it was the intention of the testator to benefit the then living descendants of the life tenants irrespective of degree.

Whether or not the court is correct in the view that an active intention for a distribution *per capita* is to be read from the will, it is certainly utterly unable to glimpse even the faintest expression of an intention for stirpital division and feels that the profession and apparent learning of the testator and the evident care exercised in the phrasing of the documents render it probable that the dis-

puted word was used by him in the sense which had theretofore been advocated by recognized authority and which was subsequently confirmed by the Court of Appeals as its correct common-law meaning.

It follows that the remainder of the residuary trust for Mary Ann Rodman is payable in its entirety to Gladys Frost Ogden, and that her interest in the Red Hook trust is payable in equal shares to Gladys Frost Ogden and her six children.

Proceed accordingly.