In the Matter of the Estate of CHARLES MORNINGSTAR, Deceased.

Surrogate's Court, Kings County, April 25, 1932.

*Gregory, Stewart & Montgomery*, for the substituted trustee.

*William J. Mahon*, special guardian.

*Murray & Manson*, for the respondents Albert E. Josephson and Lucy Josephson Fischetti.

*Chadbourne, Stanchfield & Levy*, for Louis S. Levy, as executor of the last will and testament of Albert Josephson, deceased.

*Meighan & Necarsulmer*, for Hattie S. Weidenbach.

*Joseph A. Schiavone*, for Julian A. Gregory.

WINGATE, S. It may reasonably be doubted whether those persons other than the actual litigants, if any, who read judicial opinions relating to testamentary construction, have ever realized that the process therein unfolded bears a striking similarity to a certain type of ever popular mystery fiction of the present day. The task of the central figure in these romances is to determine the perpetrator of a given criminal act, while that of the court, in testamentary interpretation, is to ascertain what disposition of his property a particular decedent desired to effect on the date when he executed his will.

The police officer or other sleuth in his quest seeks to glean all possible information from the crime perpetrated, and to assemble clews which may throw some light on the identity of the one guilty of its commission. With these bases of deduction he then employs his knowledge of human nature and customary behavior, if any, in an effort to make a correct judgment as to the identity of the perpetrator.

In some respects the task of the court is more difficult. For it the *corpus delicti* is the testamentary document, and from this, and the circumstances surrounding the testator at its execution, in so far as they are ascertainable or are more or less grudgingly disclosed in evidence, it must seek to deduce what was in the mind of the testator at the time he executed it. " It is the testator's mind we seek to read. * * * To interpret this intent we may consider the circumstances known to him when the will was made, and we may search the will itself for any language that may give us light." (Per ANDREWS, J., in *Matter of Neil*, 238 N. Y. 138, 140.) If these fail to lend a preponderance of probability to one of two or more conflicting possibilities of testator's mental attitude at the critical time, the only recourse of the court is to attempt to place himself in the situation of the testator at the moment of the performance of the testamentary act, and to decide what effects he would have envisaged by the use of the particular language employed if circumstanced as the testator then was. This is merely a practical application of the familiar thought that the acts and mental attitude of the individual who is subjected to analysis are presumed to have been those of the universally applauded but never encountered " average reasonable man."

It is precisely at this point, however, that the real difficulty of testamentary interpretation arises. While reversing the process of the " man about town " in O. Henry's familiar story, it is probable that every court, not afflicted with an inferiority complex, would admit that the mental processes of this spectral figment of legal fancy were fully comprehended by the person who daily faces him in his mirror, it by no means follows that any other court will entertain the same views respecting the probable reactions of this prototype of the populace.

Since the dawn of English chancery procedure, efforts have been made by learned and well-meaning judicial officers to erect sign-posts along the road of testamentary interpretation in an effort to standardize the legal concepts of normal conduct and to place in neatly labled categories the more commonly encountered methods of conferring testamentary benefits. These well-intentioned aids for the unfortunate judges who are presumed to be abnormal in their inability to appreciate the customary motives and aspirations of mankind, are termed the canons of construction. If they be enumerated and analyzed, however, it will be found that some one of these can almost always be cited as an authority for a diverse determination on given language and facts from that which would be reached by the application of another. It is perhaps for this reason that the tribunals which have from time to time enunciated them, have usually been careful to note that any particular " canon " becomes inoperative if in conflict with the apparent intent of the testator. This means little more than that a court is at liberty to disregard the signposts if he is satisfied that the correct route leads in a different direction.

The first step in the act of interpretation is to wholly discard from the mind every act and event which has occurred since the date on which the will was executed. The testator was not endowed with the gift of prophesy, and if the court is to attempt to place itself in his mental position, it must abandon the superiority over him which its knowledge of later happenings would give it. This truism has been repeated on innumerable occasions, perhaps never elsewhere so clearly as in *Morris* v. *Sickly* (133 N. Y. 456, at p. 459): " Clearly, circumstances occurring long after the execution of a will could not have been within the contemplation of the testator, and could, therefore, throw no light upon the meaning of language which he then used. While a will is in some sense ambulatory as to the objects and subjects with which it deals, yet it is not ambulatory as to the meaning of the language used by the testator and the intention and purpose which controlled the disposition of his property. That intention and purpose must be found to exist at

the time of the execution of the will, and cannot be varied or changed by any after-occurring events." (See, also, *Matter of Kirkman*, 134 Misc. 527, 529; *Matter of Gargiulo*, 138 id. 90, 99; *Matter of Smallman*, Id. 889, 896; *Matter of Lilienthal*, 139 id. 225, 230; *Matter of Sheffer*, Id. 519, 522; *Matter of Tuozzolo*, 141 id. 251, 253; *Matter of McCafferty*, 142 id. 371, 373–375; *Matter of Mehler*, 143 id. 63, 64; *Matter of Shevlin*, Id. 213.)

The critical date on which the state of the mind of the present testator, Charles Morningstar, is important, is July 19, 1881, twenty-three days before his death. As disclosed by documents on file in this court, of which judicial notice may be taken (*Matter of Surpless*, 142 Misc. 48, 50, and cases cited), he was a widower, with three living children, Flora Josephson and Joseph Morningstar, who were of age, and Benjamin Morningstar, an infant of sixteen. One of his children, Lucy Josephson, was dead, leaving a daughter, Bertha, who was at this time nine years of age. So far as is material for present purposes, there were also living at this time two infant grandchildren of the testator, Edgar and Walter, the children of his daughter, Flora.

The will directed the payment of general legacies aggregating $6,500, of which $1,500 was given to charity, $1,000 to employees, $1,000 each to a niece, a sister and a sister-in-law, and $500 each to another sister, another niece and a friend. Three annuities were given; the first of $250 to a sister, Betty Straus, one of $600 to a sister, Mary Loeb, and the final one, of $150 to a sister-in-law, Fanny Nachod. The entire residue of the estate was erected into a trust limited on the lives of his sons Benjamin and Joseph, but to terminate in any event on Benjamin attaining the age of twenty-one, or if he predeceased that age, when Joseph reached the age of twenty-six. This trust provided that testator's sister Betty should preside over the household and receive $6,000 annually for its maintenance, that testator's business should be continued, and from its profits annual sums in graded amounts be paid to or for his three children, and his grandchild, Bertha, daughter of his deceased daughter, Lucy, any profits in excess of these aggregate sums to be paid to his children and this grandchild in the proportions of three shares to each child and one share to the grandchild. Upon the termination of the trust, he directed, if all four were then living, that the principal should be divided among them in the same proportions. If, at the time of distribution, any had died, the share of the decedent was to be divided among the survivors. To this direction he made two exceptions, the first, presently immaterial, was to the effect that the share of Bertha should not be increased beyond one-tenth of his entire estate, and the second

reading: " and except, also, that in the case of the death, as aforesaid, of one or more of my said children, or of my said grand child, leaving a child or children, then I give the share aforesaid of such one or more of them, including my grand child, as shall have died without issue, to his or her child or children absolutely and forever."

In the eighth item testator directed the erection of separate funds for the purpose of paying the three annuities, providing that " when each annuitant shall die I direct my said executors to sell the securities which they shall have held for the purpose of raising such annuity as aforesaid and to divide the net result of such sale amongst my three children and my grand-child Bertha Josephson or amongst such of them as shall then be living in the proportion of one-tenth thereof to the said Bertha and three-tenths thereof to each of my said children paying however to the issue of such of my said children and grand-child as shall have previously died leaving issue in equal shares the sum which the parent of such issue would if living have received under this section of my will."

Although it has been stated in the brief of one of the parties without contradiction that the first annuitant, testator's sister, Betty Straus, was at the time of the execution of the will, forty-four years of age, and the second, his sister, Mary Loeb, was then fifty-four, these considerations cannot be given weight, as they have not been proven. (*Matter of Mehler*, 143 Misc. 63, 64; *Murphy* v. *Lyon*, 127 App. Div. 448, 449; *Bell* v. *Fox*, 138 id. 569, 572; *Gruhn* v. *Eppig*, 175 id. 787, 791; *Bronner* v. *Walrath*, 208 id. 758; *Brown-Duffy Goatskin Corp.* v. *Henkel*, 211 id. 342, 344; *Levenson* v. *Arnold*, 97 N. Y. Supp. 990, 991, not officially reported; *Imperial Auto Touring & Taxicab Co.* v. *Dickenson*, 161 id. 352, 353, not officially reported; *U. S. F. & S. Co.* v. *Lesser*, 171 id. 17, not officially reported.) Suffice it to note in this connection, therefore, that the annuitants benefited were sisters and a sister-in-law of the testator, in other words, contemporaries of his, presumably of no great diversity of age from him, while his named remaindermen were a son of sixteen, another son whose attainment of the age of twenty-six was apparently comparable in duration of time with the period to intervene before the younger son became twenty-one, a daughter whose age is unascertainable, and a granddaughter, aged nine.

With this diversity of generations between the two classes of beneficiaries, the annuitants on the one hand, and the children on the other, with their inferably existing like material diversity of ages, the natural thought which would have been in the mind of the testator in providing for these remainders would have been to

direct their distribution after the death of the mature or elderly life tenants, to those of the next generation in whose welfare he was particularly interested, namely, his children and the child of his deceased daughter, and this is precisely what he did. Since, however, one of his children had died, leaving a child, then nine, he would naturally have considered the possibility that others of them might also predecease the time of enjoyment of the principal. It is apparent that this thought was in his mind, for in each instance where a remainder was involved he made alternate contingent gifts of the principal, depending on whether or not the particular member of the class selected for special benefit left progeny. As is so frequently the case, the present dispute arises respecting the meaning intended by the testator in his choice of words in this alternate gift. In his use of the word " issue " in the eighth item of his will, did he mean " descendants " or " children? " That is the sole question for present determination. What had he actively in mind in this connection when he signed the document? What was his mental picture of the persons who might profit by this gift?

The benefit was to come into possessory enjoyment upon the death of two persons who were members of testator's own generation. Those who were given the first call thereon were three children and a grandchild, respectively members of the next and the second succeeding generation to that of the testator and the annuitants. To guard against intestacy and provide substantial equality among the members of the most favored class of remaindermen, he made a further limitation over. Is it probable that in this act he even remotely considered the possibility that a child of his who had only reached maturity or had not yet attained it, would grow to maturity, marry, have progeny, and die; that these children would, in turn, grow to maturity and have progeny and that all three of these additional generations would exist concurrently with a member of the age group to which testator himself belonged? Unless this mental picture existed in the mind of the testator at that time, it cannot be said that testator *intended* to confer a remainder benefit upon his great-grandchildren, the grandchildren of his then living children, since it could not be said that he had " a settled direction of the mind toward the accomplishment of ' that ' particular act." (*Matter of Mann*, 138 Misc. 42, 52; *Matter of McCafferty*, 142 id. 371, 375.) It is conceivable that he might have envisaged such an eventuality, but in view of the improbability of its occurrence, it is improbable, wherefore at least some suggestion to that effect should be found in the language

of the instrument to indicate that this improbable state of mind actually existed.

Prior to the enactment of section 47-a of the Decedent Estate Law (Laws of 1921, chap. 379), which took effect on April 30, 1921, it was the law that a gift to issue was presumed to be one to all descendants indiscriminately (*Soper* v. *Brown*, 136 N. Y. 244, 248), although it was frequently held that this presumption yielded to " a very faint glimpse of a different intention." (*Ferrer* v. *Pyne*, 81 N. Y. 281, 284; *Matter of Farmers' L. & T. Co.*, 213 id. 168, 173; *N. Y. Life Ins. & Trust Co.* v. *Winthrop*, 237 id. 93, 105; *Vincent* v. *Newhouse*, 83 id. 505, 513; *Matter of Leverich*, 135 Misc. 774, 777; affd., 234 App. Div. 625; *Matter of Mann*, 138 Misc. 42, 47 *et seq.*) It may well be doubted, however, whether a mere improbability of the use of the word by the testator in this sense as evidenced by the facts of the case at bar would alone be sufficient to overcome this presumption slight though it be.

In the opinion of the court there are, however, two places in the will where more than faint glimpses of testamentary intent to use the word " issue " in a sense other than that of indiscriminate descendant, are discernible. In the portion of the general residuary item above quoted, it seems apparent that when he referred to the " issue " of the four original remaindermen, he meant their children and not their grandchildren, since when he later referred to the possibility of their dying leaving children, he specifically stated that " in the case of the death of my said children, leaving a child or children I give the share of any child dying without issue to the said child or children of the one dying leaving children."

A circumstance which appeals to the court as even more strongly indicative of an intent of the testator to confer the alternate benefit only on the children of the preferred remaindermen under item " eighth," lies in the language of that direction itself. The provision is for payment " to the issue of such of my children and grandchild as shall have previously died leaving issue * * * the sum which the *parent* of such issue would if living have received under this section of my will." (Italics not in original.)

The only specific direction under this section, applicable to known persons at the time of the execution of the document, was that testator's daughter Flora, and his sons Benjamin and Joseph should each receive three-tenths of the corpus and his granddaughter, Bertha, should receive one-tenth. The alternate gift to their respective " issue " is of the sum the " parent " of such issue would have received, if living.

A parent as defined in the Standard Dictionary is " one who has generated a child; a father or a mother." That such is the natural

connotation of the word is demonstrated in many adjudications. (*Commonwealth* v. *Callan*, 6 Bin. [Penn.] 255, 256; *Ex parte Mason*, 5 N. C. [1 Murph.] 336, 337; *Nugent* v. *Powell*, 4 Wyo. 173; 33 Pac. 23, 30; *Atlanta & W. P. R. Co.* v. *Venable*, 65 Ga. 55, 56; *McNeil* v. *Collinson*, 130 Mass. 167, 169; *Lantznester* v. *State*, 19 Tex. App. 320, 321; *Amos* v. *Mobile & O. R. Co.*, 63 Misc. 509, 511; *Snyder* v. *Greendale Land Co.*, 48 Ind. App. 178; 91 N. E. 819, 822.)

In *Smith's Executor* v. *Smith* (65 Ky. [2 Bush] 520) the court says (at p. 525): " The definition of the word ' parent ' according to every lexicographer that we have had the opportunity to consult, is derived from ' pario,' to produce or bring forth, the regular participle of which would be ' pariens; ' but by some corruption, it is usually written ' parens,' and from which we have the word ' parent ' anglicized, which is defined as ' father or mother; ' he or she that produces young. This is the common understanding of the meaning of the term; and if it has ever been defined to embrace grandfather or grandmother, we have not been able to meet with it."

That such definition excluding more distant relationship is consistent with the usual rules of testamentary interpretation, seems obvious from the long line of cases which hold that the word " child " is never to be construed as " grandchild " in the absence of extremely clear testamentary intent to the contrary. (*Matter of Schaufele*, 252 N. Y. 65, 67; *Matter of Pulis*, 220 id. 196, 204; *Matter of King*, 217 id. 358, 361; *Pimel* v. *Betjemann*, 183 id. 194, 200; *Matter of Keogh*, 126 App. Div. 285, 287; affd., 193 N. Y. 603; *Matter of Phipard*, 182 App. Div. 357, 358; affd., 223 N. Y. 676.) Wherefore, consistency would seem to demand that " parent " should be construed to mean or include " grandparent " only on a like demonstration.

In the early English case of *Sibley* v. *Perry* (7 Ves. 522, 529, 530) it was held that substitutional gifts to " issue " of stock primarily given to " respective parents " required a construction that the gifts were to the children and not to remoter descendants of the primary beneficiaries, and such has been the holding in many New York cases. (*Murray* v. *Bronson*, 1 Dem. 217, 231, in which the applicable early cases are fully reviewed; *Clark* v. *Kittenplan*, 63 Misc. 122, 129; *Matter of Cotheal*, 121 id. 665, 666; *Matter of Lawrence*, 111 id. 524, 527; *Matter of Leonard*, 143 id. 172.) (See, also, *Drake* v. *Drake*, 134 N. Y. 220, 224; *Chwatal* v. *Schreiner*, 148 id. 683, 689.)

In *Matter of Farmers' Loan & Trust Co.* (213 N. Y. 168) this question is treated in the following language (at p. 174): " We are referred to cases in which it is suggested that the word ' issue ' should be restricted to children when used in antithesis to the word

'parent.' (*Sibley* v. *Perry*, 7 Ves. 522; *Drake* v. *Drake*, 134 N. Y. 220, 225.) That is not a rule of construction. It is merely one consideration to be weighed with others in an estimate of a testator's meaning."

*Rasquin* v. *Hamersly* (152 App. Div. 522) contributes the following (at p. 530): "There is much authority to the effect that when the word 'issue' is used in correlation with parent, it will be taken in the sense of child or children. (*Sibley* v. *Perry*, 7 Ves. 522, 530; *Drake* v. *Drake*, 134 N. Y. 220, 225; *Chwatal* v. *Schreiner*, 148 id. 683.) In *Murray* v. *Bronson* (1 Dem. 217) Surrogate Rollins reviews the cases down to 1883 and concludes: 'The word "issue" in a will, when used in correlation to "parent," in the absence of manifest indications that it is intended to have a broader import, means "children" and excludes remoter descendants.' But this is not an invariable rule."

While, therefore, a determination that the word "issue" when used as a correlative with "parent" means child, "is not an invariable rule" and "is merely one consideration to be weighed with others in an estimate of a testator's meaning," in the opinion of the court, its use coupled with the circumstances surrounding this testator at the time he made the will, the objects of his bounty whom he presumably had in mind, and his apparently interchangeable use of the words "issue" and "children," is all which is requisite in the case at bar to give that "very faint glimpse of a different intention" needed to take this case out of the rule of *Soper* v. *Brown*. It results, therefore, that the pertinent portion of item "eighth" of the will is construed to read as follows: "paying to the children of such of my said children and grandchild as shall have previously died leaving children, in equal shares, the sum which the parent of such children would, if living, have received under this section of my will."

This "eighth" item contains not even the slightest suggestion of words of present gift. The sole direction looks to the future and contemplates the sale of the securities composing the principal fund and the division of the proceeds among the individuals who shall then answer the description of the ultimate remaindermen, all of which acts are to be performed after the death of the respective annuitants. The remainder estate created was, therefore, wholly contingent. (*N. Y. Life Ins. & Trust Co.* v. *Winthrop*, 237 N. Y. 93, 97; *Matter of Buechner*, 226 id. 440, 443; *Smith* v. *Edwards*, 88 id. 92, 103, 104; *Robinson* v. *Martin*, 200 id. 159; *Salter* v. *Drowne*, 205 id. 204, 216.)

By the language employed, the testator's substitutionary gift was clearly one to a class composed of the children of the particular

deceased child or grandchild who might be living at the time of distribution, which was upon the death of the several life tenants. (*Salter* v. *Drowne,* 205 N. Y. 204, 216; *Herzog* v. *Title Guarantee & Trust Co.,* 177 id. 86, 97; *Teed* v. *Morton,* 60 id. 502, 506; *Bisson* v. *W. S. R. R. Co.,* 143 id. 125, 130; *Matter of Allen,* 151 id. 243, 247; *Delaney* v. *McCormack,* 88 id. 174, 183; *Matter of Leonard,* 218 id. 513, 521; *Matter of Terwilligar,* 135 Misc. 170, 187; affd., 230 App. Div. 763; *Matter of Harned,* 138 Misc. 546, 548; affd., 234 App. Div. 796; *Matter of Ackerman,* 137 Misc. 910, 915; *Matter of Sheffer,* 139 id. 519, 524; *Matter of Wolf,* 140 id. 595, 596; *Matter of Leonard,* 143 id. 172.)

With these principles in mind, the distribution of the sums now in the hands of the trustee becomes obvious.

On May 23, 1907, Benjamin F. Morningstar assigned all of his rights in the remainders to Joseph Morningstar, and a like assignment to the latter was accomplished on March 16, 1903, by Albert Josephson, as administrator of Flora, and by Walter S. Josephson, Edgar Josephson and Marie Helen Josephson. Whereas all of the interests thus assigned were contingent, this did not affect the validity of such assignments. (Real Prop. Law, § 59.) Their effect, as determined by the event, was to vest in Joseph Morningstar all rights of Flora and her children and also of Benjamin in the remainders of the funds erected to pay the annuities both of Betty Straus and Mary Loeb. Joseph Morningstar by his payment to testator's granddaughter, Bertha, of her interest in the fund for Betty Straus became entitled to her share therein. It follows, therefore, that at the time of his death, Joseph Morningstar was entitled to the entire principal of the fund for Betty Straus, three-tenths by virtue of the assignment from the children of Flora, three-tenths by virtue of the assignment from Benjamin, three-tenths in his own right, and the remaining one-tenth by purchase from Bertha. At his death, also, he was entitled on the death of Mary Loeb to three-tenths of the fund erected for her, by reason of the assignment from the children of Flora and to an additional three-tenths by reason of the assignment from Benjamin. These interests passed to his estate and, subject to the rights of its creditors, are distributable only therefrom. The three-tenths of the remainder of the fund for Mary Loeb's annuity given to Joseph Morningstar as primary remainderman, passed on her death to his children under the substitutional gift in testator's will, since Joseph predeceased the annuitant. Except for the assignments thereof, hereinafter noted, one-sixth thereof would now be payable to each of the following, namely, Joseph Morningstar, 2d, Benjamin P. Morningstar, Karl Illava, Percy Morningstar, Flora M. Owen and

Marie M. Maclennan. All of these persons with the exception of Mrs. Maclennan have, however, made one or more assignments of their interests which serve *pro tanto* to divest them of their distributive rights as set forth in the will.

On May 19, 1920, Joseph Morningstar, 2d, Percy Morningstar and Karl Illava assigned their interests to Edward Weidenbach as collateral security for a note of $4,000. This assignment was duly recorded in this court on February 11, 1927. The obligation and collateral are now the property of Hattie W. Weidenbach who is, therefore, entitled to the first payment from these distributive shares to the extent of such $4,000 and interest.

On December 9, 1927, all of these children of Joseph Morningstar, except Marie M. Maclennan, assigned to Julian A. Gregory their interests in this fund to the extent of $800 each. This assignment was duly recorded in this court on December 11, 1931, and constitutes a second lien on the distributive shares of Joseph Morningstar, 2d, Percy Morningstar and Karl Illava and a first lien on those of Benjamin P. Morningstar and Flora M. Owen.

The share of Marie M. Maclennan is, obviously, to be paid to her in full.

The one-tenth interest in the remainder of the Mary Loeb fund, primarily dedicated to Bertha Josephson, is payable, by reason of the substitutional gift to her children and her predecease of the annuitant, to Lucille B. Hodges and Adele B. Bratton in equal shares.

A final question of the effectiveness of the publication of the citation in this proceeding for the purpose of giving this court jurisdiction over certain respondents, deserves a word of passing comment. The citation, as issued, named thirty-four respondents, of whom six were named in a representative capacity with consequent prolixity of description. Ten of these were non-residents, and in respect to them an order of service by publication was secured. The citation, as published, contained only the names of these ten, and the question has been raised as to whether this publication was not defective, by reason of the omission therefrom of the names of the twenty-four residents who were personally served and whose service by publication was not legally permissible. This question is capable of ready answer. Certain popular beliefs to the contrary notwithstanding, the law does not require the performance of vain and futile acts merely for the purpose of involving litigants in unnecessary trouble or useless expense. The purpose of a citation or other legal process is to give the persons whose rights are in jeopardy adequate notice of the hearing at which they will be determined. It has been uniformly held that

where this is accomplished, all is done which is requisite. (*Van Wyck* v. *Hardy*, 11 Abb. Pr. 473, 477; affd., 4 Abb. Dec. 496, 499; *Cook* v. *Kelsey*, 19 N. Y. 412, 415, 416; *Brenen* v. *North*, 7 App. Div. 79, 83.) This was accomplished in the present instance, and the action of the petitioner in saving unnecessary and wholly futile expense to the estate is to be commended.

Proceed accordingly.