ANTONIO LLOPART MORELL, Plaintiff and Appellant-Appellee, v. PROVIDENCIA MESORANA HUETE, Defendant and Appellee-Appellant.

No. 6985. Argued November 22, 1935.—Decided December 23, 1935.

*M. García Cabrera* and *Riera & Gutiérrez Franqui* for appellant-appellee. *Eduardo Urrutia Martorell* for appellee-appellant.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

Antonio Llopart Morell and Providencia Mesorana Huete lived in concubinage from 1919 to 1933. They had two sons, named Antonio and Pablo, who are at present ten and eight years old, respectively. They agreed to a separation. Upon consummation of such separation the parties, by a public deed, agreed upon certain matters relating to the property acquired during the existence of their cohabitation and also to the custody and care of the above-mentioned minors.

It was stated in the said deed that the parties had never contracted marriage and that the property which appeared recorded in the registry of property as community property was not ganancial property but belonged to the separate estate of Llopart. The parties further stated in said deed that the minors, Antonio and Pablo, had been registered in the civil registry as legitimate children, which circumstance is not true because the parties were never married to each other. They, however, acknowledged the minors as their natural children. The parties stipulated that the two sons should continue under the custody and care of their mother; that the father would have access to his children and that he could have them with him as long as reasonably possible. They also agreed that the father would give them an allowance of $25 weekly. Moreover, a house in Santurce was conveyed to the minors, the usufruct thereof being granted to the mother. It was likewise agreed that the father would reserve to himself the right to claim the custody of his children in case the conduct of the mother was such as to

make the father reasonably think that it affected the morals and welfare of his children.

Subsequently the mother of the children married Luis Jordán who went to live with her in the house donated by the father to his children.

Antonio, the eldest of the children, was sent to the "Colegio Ponceño de Varones," as agreed upon by the parties, the expenses to be defrayed by the father. Early during the Christmas holidays of 1934, the father brought Antonio from Ponce and placed him under the care of Benito Alvarez, who resides in Miramar. The mother called at the latter's house and took Antonio to her home.

In this situation, Antonio Llopart Morell filed in the District Court of San Juan a petition for a writ of habeas corpus directed to Providencia Mesorana Huete, seeking to recover the custody of both minors, Antonio and Pablo.

The writ was issued and, after hearing the case, the district court decided that the minor Antonio Llopart should be sent to a boarding school within the judicial district of San Juan and that the minor Pablo Llopart should remain under the custody of the mother.

Feeling aggrieved by that decision as to the minor Pablo, the father, Antonio Llopart Morell, took an appeal to this court. Providencia Mesorana also appealed from said decision, but only as regards the failure to impose costs on the petitioner Antonio Llopart Morell.

The appellant father has assigned as an only error the holding of the court that the minor Pablo should remain under the custody of the mother, which holding, according to the appellant, is contrary to the provisions of sections 154 and 166 of the Civil Code of Puerto Rico, 1930 ed. He also maintains that the decision complained of is a clear abuse of the discretion which has been vested by the jurisprudence in district courts as *parens patriae*.

■ ■ According to the Partidas, "*patria potestas* is the power held by parents over their children." Partida IV,

tit. 17, law 1. This power, which had its origin in the Roman law, reached in ancient times extraordinary proportions. The father, as the head, master, and lord of the family, could dispose of his children as if they were chattels. The child, when he was not emancipated by his father's will, remained, even if married, during his entire life, and together with his off-spring, under the *potestas* of his father. The concept of the *patria potestas,* so rigid at first, underwent in its evolution some modifications which restricted the authority of the father, forbidding him to punish his children for the commission of crimes, authorizing him to do so moderately in the case of faults,- and creating and developing the *peculium* doctrine which regulated the patrimonial relations between parent and child; but, as pointed out by Laurent, the principle from which barbarism sprang subsisted: the concept of control or the absence of personality.

Rome paid too much attention to the father's authority and disregarded the child's interest. The former was vested with excessive powers, his rights were of more importance than his duties, and the institution of the *patria potestas* instead of being created for the benefit of the child tended to consecrate and assert the parental authority, even to deplorable extremes. From that day to this things have changed. The father has ceased to be a master and has become a protector. Modern legislation, inspired in natural laws, has concerned itself rather with the duties than with the rights of the father, who has also responded to the call of the natural law which compels him to sacrifice himself for the sake of his children, to secure their happiness, to look after their education, their moral, intellectual and physical development, and, in short, to prepare them to face the problems and responsibilities of the future within the family circle and in the wider field of society. The modern codes have deviated from the old law, and it may be said with the commentator Laurent, that a very wide chasm exists

between the old and the new principles. Our code reflects this transformation.

There are those who oppose the Germanic to the Romanic type and maintain that the latter, based exclusively on the interests of the parent, turns the parent into an absolute chief and master of the household rather than into a father of the family; whereas the former mainly sought the interest of the child, the father being his protector and not his master. In France the Germanic spirit prevailed in some regions and the Romanic spirit in others. In Spain a marked difference is noticeable between the Partidas on the one hand and the Fuero Juzgo and the Fuero Real on the other. The former literally followed the path laid out by the Roman law; the latter were inspired on principles more humane and more in harmony with natural law, vesting the mother, upon the death of the father, with the custody of her children and acknowledging in her favor the *patria potestas*, although this was not done with the necessary clearness.

In 1870, the Civil Marriage Act asserted the *patria potestas* of the mother. The act, in its preamble (*exposición de motivos*), sets forth the basis of the reform thus:

"Now is the time to eradicate from our legislation the vestiges of the pagan Roman law which received a mortal blow from the Christian faith that raised woman to her proper place in the household. Whether or not it is true that Visigothic legislation granted to the mother authority over her children, it can not be denied that such legislation embodied a much higher doctrine regarding women than that modeled after the Roman law, and that the said doctrine pervades our local laws (*legislación foral*) in more or less concrete form. Therefore, the enactment of the act should rather be considered as the ultimate development of the doctrine aiming at the legal emancipation of woman and the acknowledgment of her rights within the household than as an innovation. The germ of this doctrine was planted in the world together with the Christian faith, it being gradually developed afterwards in our national legislation with the institution of the conjugal partnership or with the rights granted to the mother over her children and their property, until it was fully developed with the provisions of the act, which

will not be rejected by anybody who knows how much tenderness, foresight, and wisdom can be treasured in the heart of a mother whose life is centered on the welfare and future of her children.''

To the same effect are the comments of García Goyena:

''. . . by conferring on the mother the rights granted to the father, the lawmaker establishes an equality of right and compensation where Nature had established an equality of hardships, cares, and affections; he redresses with equitable provisions the injustice of many centuries; in a certain way he introduces the mother for the first time into the household and restores her to the inalienable rights to which she was entitled by nature, sacred rights utterly ignored by ancient legislations, acknowledged and adopted by some of our *fueros,* but which, even if stricken from our statutes, should remain written in indelible characters in the heart of all wellborn children.''

The *patria potestas* established by the Civil Marriage Act has been acknowledged and ratified in our Civil Code, which also vests it in natural as well as adopting parents. The provisions of said code, which are based on principles of natural law and were ignored by the Roman law, make the *patria potestas,* exclusively enjoyed by those legally married, extensive to the natural and the adoptive households.

Section 154 of the Spanish Civil Code reads thus:

''The father or, in his default, the mother may exercise parental power over their unemancipated legitimate children, and the children are bound to obey the parents while subject to such authority and at all times to treat them with respect and reverence.

''Acknowledged natural children and adopted minors are subject to the authority of the father or mother who acknowledges or adopts them and are subject to the obligations mentioned in the next preceding paragraph.''

Section 152 of our Civil Code, 1930 ed., which according to the appellant has been infringed, provides as follows:

''The *patria potestas* over the legitimate children not emancipated belongs in the first place to the father, and in case of his absence, legal incapacity or death, to the mother.

"Illegitimate children and adopted minors shall be under the *potestas* of the father or mother acknowledging or adopting them. Where they have been acknowledged or adopted by both parents, the provision of paragraph one of this section shall be applicable."

A marked difference is noticeable between the Spanish and the Puerto Rican codes as regards natural and adopted children. The former vests the *patria potestas* in the father or the mother who acknowledges or adopts them; the latter provides that where they have been acknowledged or adopted by both parents, the provision of paragraph one of section 152 shall be applicable, that is, that in the first place the father shall be entitled to the *patria potestas,* and that in his absence, legal incapacity, or death, it will belong to the mother.

Our code confers upon the father of the natural child the same preference acknowledged in favor of the legitimate father. The situation, however, is different. Commenting on section 155 of the Spanish Civil Code (equivalent to section 153 of our Civil Code, 1930 ed.), according to which the father or, in his default, the mother has with respect to their unemancipated children the duty, among others, of keeping them in their company, Scaevola says that if the legitimate father enjoys a preference as regards certain effects of the *patria potestas* (because with respect to others there is equality), in fact at least as between the parents, it can not be that the natural father should always be preferred to the mother. He further says that marriage constitutes an entity and that the law confers a preference on the husband. The natural father and mother are two distinct personalities with exactly similar rights, without the possibility of either of them prevailing over the other. According to Scaevola, as both parents are vested with the *patria potestas,* without constituting a new entity, the parent who first acknowledges the child should be entitled to keep him in his or her company. 3 Scaevola 278. As we have already stated, the learned commentator expresses this view in commenting on

section 155 of the Spanish Civil Code. His statements, however, may have reference to section 154 of the Civil Code, which fails to provide for the case where both parents have acknowledged the child so as to designate which of them should be entitled to the *patria potestas*. However, be that as it may, the fact remains that the cited commentator has very vividly stated the difference existing between marital ties and the illegitimate relationship. Further on Scaevola says that in the illegitimate household there is not the unity to be found in the legitimate one, which constitutes the conjugal partnership, and that in the former, with or without *patria potestas,* the father and the mother have not as between themselves any legal tie from which derives the preference of the husband over the wife.

In his dissenting opinion in *Arbona* v. *Torres,* 24 P.R.R. 423, 428, 431, Mr. Chief Justice Hernández says that in determining the effects of the *patria potestas* regarding the persons of the children, section 223 of the Civil Code (section 153, 1930 ed.) apparently refers to a normal condition in which the husband and wife live together with their children, whether legitimate or natural, under the same roof. From said dissenting· opinion, which was subsequently adopted by this court in *Chabert* v. *Sánchez,* 29 P.R.R. 225, 236, we transcribe the following:

"The Legislature has made no express provision for cases of dissolved illicit relations between a man and a woman during which natural children were born, and it seems to us·to be contrary to common reason and equity that the mother of a natural child should be denied all rights during the life of the father who acknowledged the offspring of such relations, and that the father who without cause deserts the woman who has borne him children should be allowed privileges which are denied to a man who begets children in lawful wedlock and abandons his lawful wife. Such a theory would lead to the absurd conclusion that a father, more unnatural than natural, has the right to tear his acknowledged child from the arms of its mother during the first days of its existence when it still requires nursing."

The example cited by Chief Justice Hernández is convincing and conclusive. We do not think that any court exists which would uphold the absurdity above referred to; but if there be one, if an illegitimate father were allowed to tear from the arms of the mother her newly born child, such a court would be infringing the most elementary principles of natural law and of justice.

"It is not possible," further says Mr. Chief Justice Hernández in his opinion, "to lay down as an absolute and inflexible principle that a natural child must live with the father who acknowledged it and exercises the right of *patria potestas* over it. The conditions of the exercise of that right should regulated by the courts in accordance with the special circumstances of each case, always bearing in mind that the *patria potestas* under our present law is not for the benefit of the father or the mother, but for the benefit of the child which requires it."

In *Chabert* v. *Sánchez, supra,* the principles announced by Mr. Chief Justice Hernández in his dissenting opinion were reproduced and expanded, and the same doctrine has been reaffirmed in subsequent decisions of this court. *Blanco* v. *Hernández,* 32 P.R.R. 20, *Babá* v. *Rodríguez,* 36 P.R.R. 453, *Ex parte Maldonado,* 42 P.R.R. 832, *Chardón* v. *District Court,* 45 P.R.R. 604.

Our Civil Code can not repudiate the conclusions of Mr. Chief Justice Hernández, because they are inspired in genuinely natural and humane feelings and because they uphold the principle, which has been adopted by modern legal text writers, that the *patria potestas* has not been established for the benefit of the parents but for the benefit of the child.

In regard to the custody of the children and referring indiscriminately to parents, whether legitimate or illegitimate, the commentator Manresa says:

"Under the Code it is the further duty of the parents to keep the children in their company. It is indeed a part of the care required by phisical beings to provide them with *a place of abode,*

as expressed in the Partidas; but at the same time it is a right to which parents are entitled in order to properly perform the duties above stated. As a right it could be relinquished, but not so as a duty. We think, however, that where this is contrary to the interests of the child, and as such duty is precisely imposed for the child's benefit, the father may direct that he should live away from the home, as happens where it is so required by his studies or his profession." Manresa, "*Comentarios al Código Civil,*" vol. 2, p. 18.

The learned commentator aptly says that the custody of the children by the father is both a duty and a right. As a right, it can be relinquished by the father for the child's benefit so that the latter may live in the mother's home, under her immediate custody and protection, and receive the tender care and attention of a loving mother. As a duty, it has been imposed on the father for the benefit of the child, and if by placing the latter in the custody of the mother the purpose of the law seeking the welfare of the child is attained the principles of natural law are not thereby infringed but on the contrary such action would be in accord with them and with the intention of the lawmaker, since that purpose is better accomplished in the arms of the mother than in the company of the father.

In *Ex parte Kirschner*, 111 Atl. 737, decided by the Court of Chancery of New Jersey, it was said that—

"There is an important distinction between (*a*) the parents' rights of custody and (*b*) the parents' duty with respect to support. The two things are wide apart. The parental right may be transferred or abandoned. Except by adoption proceedings the parental duty is untransferable."

In *Nugent* v. *Powell*, 20 L.R.A. 199, 202–203, the Supreme Court of Wyoming said:

"But what are the rights of a father with respect to his child? It is claimed in this case, and there are many sayings in the books, that the common law the father has the paramount right to the custody of his child, and that, independently of statutes, such is the prevailing rule in America. If this statement simply means that, inasmuch as the law has imposed upon the father the duty of

caring for and maintaining his minor child, and therefore has given him the custody and control of it in order that he might the better perform these duties, the statement may be accepted as accurate; and in a general way it may be said that, all things being equal, the father has a better right to the custody and services of his child that has the mother, because the law primarily imposes upon the father the duty of maintenance and nurture. But it is, I think well settled that the father has not an absolute vested right in the custody of his child. *Judge* Story, in the case of *United States* v. *Green,* 3 Mason, 485, states what I conceive to be the true rule, as follows: 'As to the question of the right of the father to have the custody of his infant child in a general sense, it is true. But this is not on account of any absolute right of the father, but for the benefit of the infant; the law presuming it to be for its interest to be under the nurture and care of his natural protector, both for maintenance and education. . . . . It is an entire mistake to suppose the court is at all events bound to deliver over the infant to his father, or that the latter has an absolute right in the custody.' It may well be doubted whether the rule of the common law was other than as stated in the case above cited. From an examination of the authorities it will be found that prior to 1804, the English courts entertained precisely the views expressed by *Judge* Story, and quoted above. In that year the decisions in England took a direction in favor of establishing the paramount right of the father to the custody of his infant child, and continued in that direction until they culminated in the famous decision rendered in 1836 in the case of *King* v. *Greenhill,* 4 Ad. & El. 624, in which case three children, females aged respectively 5½, 4½, and 2½ years, were in custody of the mother, a woman of unblemished, reproachless character. Upon application of the father, who was living in open adultery with another woman, the children were taken from the mother, and delivered over to the custody of the father. These decisions led to the introduction of a bill in parliament relating to the custody of infants, which finally, in 1838 or 1839, became a law, and restored the mother to her natural rights, and put her upon an equality with her husband in relation to the care and custody of her children within the age of nurture. In the debate upon the bill *Lord* Lyndhurst, referring to the decision in *King* v. *Greenhill,* said: 'As the laws now stand, the father of a child born in lawful wedlock was entitled to the entire and absolute control and custody of that child, and to exclude from any share in that control and custody the mother of that child. The mother might

be the most virtuous woman that ever lived, amiable in her manners, fond and attached to her children. The father, on the other hand, might be profligate in character, brutal in manner, living in adultery and yet would have the right, under the existing law, to the custody of the children of his marriage to the exclusion of even access to them of his wife, their mother.' *Lord* Denman, who was the chief justice of the king's bench, and who concurred in the decision in the above-cited case, in the course of the debate upon the bill referred to said: In the *Case of Greenhill*, which had been decided in 1836 before himself and the other judges of the king's bench, he believed that there was not one judge who had not felt ashamed of the state of the law, and that it was such as to render it odious in the eyes of the country. The effect in that case was to enable the father to take his children from his young and blameless wife, and place them in charge of a woman with whom he then cohabited. If such was the common law of England, it is not surprising that *Lord* Denman might say he was ashamed of it. But, as stated by *Chief Justice* Ranney in *Gishwiler* v. *Dodez,* 4 Ohio St. 623, I am strongly disposed to think that the learned chief justice of the king's bench mistook a judicial excrescence upon the law for the law itself, and that parliament did little more than restore it to its former condition. If however, the English cases alluded to were fair expressions of the common law, it is safe to say that they have never found place in American jurisprudence; and I have no sort of doubt but that in American jurisprudence the right of a father to the custody of his child is not an absolute inalienable right, but that it is in all cases referable and subordinate to the interest and welfare of the child. *Mercein* v. *People,* 25 Wend. 64. It has been said that 'by the law of nature the father has no paramount right to the custody of his child. By that law the wife and child are equal to the husband and father. . . . . There is no parental authority independent of the supreme power of the state, but the former is derived altogether from the latter. In the civil state there is no inequality between the father and the mother. Ordinarily, a child during infancy is entirely under the discipline of its mother; and very frequently wives discharge the duty of education of their children better than the husbands. . . ' "

The principles announced in the foregoing opinion can not be in conflict with our civil law, which today acknowl-edges to the mother rights that should never have been denied to her.

■ The appellant contends that section 166 of the Civil Code enumerates those cases in which parents may be deprived of the *patria potestas* or the exercise thereof may be suspended, and admits the doctrine that where the custody of minors is involved the mere right of *patria potestas* should not prevail over the minors' convenience and welfare. But he claims that in none of the cases decided by this court the power of a court to deprive a father of the custody of his children has been upheld, except under circumstances warranting such an extreme and radical measure. According to the appellant such circumstances do not concur in the instant case. It is well to state that the custody of children is one of the effects of the *patria potestas,* and that the mere fact that in particular cases the exercise thereof is regulated by the State through its courts does not necessarily mean that the father is deprived of the *patria potestas.*

■ From the evidence herein it appears that the petitioner lived in concubinage with Mrs. Mesorana for a period of fourteen years and that they had two sons whom the father chose not to legitimize, but who were registered as legitimate in the civil registry. The property acquired during such cohabitation went to the father, save a small house given in usufruct to the mother during the minority of their children, to whom the naked ownership thereof was conveyed. In other respects, the father has satisfactorily fulfilled his duty of supporting his children, and it is insistently argued that in view of his conduct and it not having been shown that the welfare of the minor Pablo requires that the latter should live with his mother, the custody of said minor ought to be awarded to his natural father. However, the parents entered into an agreement whereby the children were left under the custody of their mother, with the right reserved to the father of reclaiming the same in the event the mother committed any act justifying a reasonable belief on the part of the father that the morals and welfare of his children would be endangered. From the evidence it does not appear

that the mother ever committed any such act. On the contrary, it has been shown that Mrs. Mesorana married after the separation and that said minor now lives with her in a legally constituted home. The mother's status is at present higher than the one she had when she was living in concubinage with the petitioner. As to the welfare of the children, it is to be supposed that the same was taken into account by the petitioner when entrusting their custody to their mother by virtue of an agreement executed before a notary at the time of the separation. It is logical to assume that the mother was given the custody of the children because it was thought by the parties to the agreement that they would be better taken care of living with the mother than with the father, who had not an established home. Circumstances have not changed in regard to the petitioner who still leads a bachelor's life and who, being unable to offer a home of his own to his children, has proposed to take them to a friend's home; but they have indeed changed favorably as regards the mother who has improved her civil status by marrying. In our judgment, the petitioner contracted a valid undertaking which he is bound to respect so long as the welfare of the minor is not prejudiced. It is inconceivable to us how an agreement, whereby a father entrusts the custody of his children to their mother, can be considered as contrary to morals and public policy, especially when the children are of tender age. Natural reason upholds the opposite of that proposition. Morals and public policy can not suffer because children are afforded the care necessary for their welfare. It is a fact that such care as requires abnegation and sacrifice is not generally given by the father but by the mother, whom Nature has filled with the tenderness and love incident to motherhood.

It has been held by most American courts that contracts of this kind, entered into between the father and the mother regarding the custody of their minor children, are valid

and should be enforced, provided the welfare of such children is not prejudiced.

In *Edleson* v. *Edleson,* 179 Ky. 300, 313, the Supreme Court of Kentucky said:

"The chancellor, in fixing the custody of a minor child, will keep in view, primarily, the welfare of the child, and in case of a separation of father and mother will confide its custody to the parent, who is most suitable to the trust, if either, as the right of each to its custody is of equal dignity. It is, however, not illegal for the parents, who have separated to enter into a contract with each other for the custody and maintenance of their child, but the court will not recognize such contract, unless it is one, which insures the proper care and maintenance of the child. If the contract is such a one, as the court would approve, keeping the welfare of the child in view, it may recognize the contract, but such contract will not be enforced longer than it appears to be for the best interests of the child, and parents entering into such a contract are presumed to do so in contemplation of their obligations under the law and the rights of the child. So long, however, as the court recognizes the contract, which has been entered into between the parents, its provisions should be enforced. The court, however, may confide the custody of the child to the mother and require the father to contribute to its maintenance, if their respective suitability for its custody and financial circumstances render such a disposition necessary to the proper care of the child."

In *Carpenter* v. *Carpenter,* 149 Mich. 138, 140, it was said that—

"A husband and wife, on separating, may make a valid contract for the care of their minor children. Such contract, while valid between the parties, will not be sustained to the detriment of the minor child, whose interests are of the first consideration."

In *Tiffany & Co.* v. *Spreckles,* 202 Cal. 778, 791, the court said:

"Parents have a legal right to contract with each other as to the custody and control of their offspring. (Citations.) This right, however, is subject to the control of the court in proceedings wherein the welfare of the child is involved. (Citation.) But as between the parents, themselves, a promise by one parent that the other

may have the custody and control of their child is legal and is sufficient consideration to support an agreement on the part of the parent in whose favor the promise is made.''

In *Nugent* v. *Powell, supra,* it was said:

''In *Clark* v. *Bayer,* 32 Ohio St. 310, 30 Am. Rep. 593, the court, after an exhaustive review of the authorities, says: 'From authority and reason the following propositions may be stated generally: (1) As a general rule, the parents are entitled to the custody of their minor children. When the parents are living apart, the father is prima facie entitled to that custody; and when he is a suitable person, able and willing to support and care for them, his right is paramount to that of all other persons except that of the mother in cases where the infant child is of such tender years as to require her present care; but in all cases of controverted right to custody the welfare of the minor is first to be considered. (2) The father's right however, is not absolute under all circumstances. He may relinquish it by contract, forfeit it by abandonment, lose it by being in a condition of total inability to afford his minor children necessary care and support.' ''

In *Brice* v. *Brice,* 50 Mont. 388, 394, 147 Pac. 164, 166, the Supreme Court of Montana, held:

''As between the husband and wife, an agreement touching the custody and maintenance of the children will be respected and enforced, yet such an agreement cannot, as against the children, divest either parent of the paramount duty imposed both by law to support and educate them.''

In *Maxwell* v. *Boyd,* 123 Mo. App. 334, 338–339, the court said:

''That contracts of separation between husband and wife are against public policy, and are non-enforceable at law or in equity, is a well-settled doctrine; the plaintiff concedes as much. But the suit is not between the husband and wife on the contract, nor to enforce any provision of the contract which would inure to the profit or pecuniary advantage of the wife. The defendant occupies this position: He surrendered the care and custody of his infant child to another and contracted to pay to a third person, as trustee, the sum of fifty dollars per annum for the support of his child.

He contracted to do what both the laws of nature and of the land say he should do, and what the laws of the land, in a proper case, will compel him to do. Now can it be, that for the reason he selected his wife, with whom he agreed to and does live separate, as the custodian of his child, he is relieved from doing what he ought to do and contracted to do? We think not. We think that while so much of the contract as provides for the separation of defendant and his wife is void, that part which obliges him to pay fifty dollars per annum for the support of his child is binding on him during the child's minority, if he permits the conditions to continue which he not only assented to, but brought about by his own act and has subsequently ratified by successive payments to the trustee for the child. The agreement as to the child has none of the vitiating elements of a contract of separation between husband and wife. This view is supported by the case of *Meyer* v. *Kuechler*, 10 Mo. App. 371. The defendant could not relieve himself of his obligation to support his child, by agreeing to live separate from his wife and by giving her its custody."

In the last-cited case, the court, notwithstanding it held void so much of the contract as provided for the separation, considered as valid the stipulation placing the minor under the custody of the mother. The case at bar fails even to offer such a complication, because the separation involved is not one between husband and wife but one between two persons who were living in concubinage and agreed to a separation, the children born to them to remain under the custody of the mother.

The lower court refused to impose costs on the petitioner, and the mother has appealed from such refusal. We do not feel disposed to disturb this pronouncement of the court *a quo*, made in the exercise of its judicial discretion.

The order appealed from must be affirmed.

Mr. Justice Wolf concurs in the result.

Mr. Justice Aldrey took no part in the decision of this case.